# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT BARFIELD, ET AL<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>SCOTT SEMPLE *in his individual capacity*<br>AND ROLLIN COOK *in his official capacity as*<br>*Commissioner of the Connecticut Department of*<br>*Correction*<br><br>　　　Defendants. | No. 3:18-cv-1198 (MPS) |

## RULING ON MOTION TO DISMISS

Plaintiffs Robert Barfield, John Knapp, Curtis Davis, Jason Barberi, and Darnell Tatem (together, "named Plaintiffs" or "Plaintiffs") bring this lawsuit regarding medical care for incarcerated people infected with Hepatitis C against Rollin Cook in his official capacity as Commissioner of the Connecticut Department of Correction ("CT DOC") and against former Commissioner Scott Semple in his individual capacity (together, "Defendants"[1]). As to Cook, Plaintiffs assert (1) deliberate indifference to medical needs in violation of the Eighth Amendment under 42 U.S.C. § 1983 (count one); (2) violation of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* (count two); and (3) violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* (count three). As to Semple, they assert deliberate indifference to medical needs in violation of the Eighth Amendment under 42 U.S.C. § 1983 (count four). Plaintiffs seek to

---

[1] Plaintiffs initially brought suit against Semple in both his official and individual capacities. ECF No. 35 at ¶ 14. However, after Cook became the new Commissioner of the CT DOC, the Plaintiffs moved to substitute Cook as the official capacity defendant under Federal Rule of Civil Procedure 25(d). ECF No. 44. Absent objection, the Court granted the motion to substitute. ECF No. 48.

represent a "class of all current and future prisoners in CT DOC custody who have been diagnosed, or will be diagnosed, with chronic HCV." ECF No. 35 at ¶ 346. They seek damages as well as declaratory and injunctive relief. Defendants moved to dismiss all claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

For the reasons discussed below, the Defendants' motion to dismiss is GRANTED as to the Eighth Amendment claim against Semple in his individual capacity, GRANTED as to the Americans with Disabilities Act and Rehabilitation Act claims, and DENIED as to the Eighth Amendment claim against Cook in his official capacity.

## I.  FACTS

The following facts are drawn from the corrected first amended complaint, which was filed on December 21, 2018 and which I will refer to as the "operative complaint." ECF No. 35. These facts are accepted as true for the purpose of deciding the Defendants' motion to dismiss.

### A.  Hepatitis C

Hepatitis C is a blood-borne disease caused by the Hepatitis C Virus ("HCV"). ECF No. 35 at ¶ 25. HCV causes inflammation that damages liver cells, and is a leading cause of liver disease and liver transplants. *Id*. It is transmitted through contact with infected blood and can be transmitted through intravenous drug use, tattooing, blood transfusions, and sexual activity. *Id*. at ¶ 26. HCV can be either acute or chronic. *Id*. at ¶ 27. Acute HCV clears itself from the blood stream within six months of exposure. *Id*. Chronic HCV is a long-term illness that is defined as having a detectable HCV viral level in the blood six months after exposure. *Id*. People with chronic HCV develop fibrosis of the liver, which is a process that replaces healthy liver tissue with scarring, thereby reducing liver function. *Id*. at ¶ 29. When scar tissue takes over most of the liver, it is called cirrhosis. *Id*. at ¶ 30. Cirrhosis may not be reversible and can cause

complications even after the HCV is treated. *Id*. at ¶ 33. Fibrosis can also lead to liver cancer. *Id*. at ¶ 29. In addition, chronic HCV can cause kidney disease, internal bleeding, and a host of other serious medical issues. *Id*. at ¶¶ 28-31, 35. It can also cause death. *Id*. at ¶ 31.

Approximately 2.7 to 3.9 million Americans have chronic HCV and approximately 19,000 people die of HCV-caused liver disease each year in the United States. *Id*. at ¶¶ 39, 42. The prevalence of HCV in prison is much higher than in the general population. *Id*. at ¶ 44. It is not clear how many people in the CT DOC system have HCV, but a recent study shows that 10-12 percent of the population at the New Haven Correctional Center had HCV in 2015. *Id*. at ¶¶ 45, 55, 58.

### B.    Standard of Care for HCV

In the past, the standard treatment for HCV, which included the use of interferon and ribavirin medications, had long treatment durations, failed to cure most patients, and was associated with many side effects. *Id*. at ¶ 62. In 2011, however, the Food and Drug Administration ("FDA") began approving new oral medications called direct-acting antiviral drugs ("DAAs"). *Id*. at ¶ 63.While the DAAs were initially designed to work with the old treatment regimen, in 2013 the FDA began to approve DAAs that can be taken alone. *Id*. DAAs work more quickly, cause fewer side effects, and treat chronic HCV more effectively than the old treatment; in fact, 90 to 95 percent of HCV patients treated with DAAs are cured, whereas the old treatment regime cured only roughly one-third of patients. *Id*. at ¶¶ 63-65.[2]

The American Association for the Study of Liver Diseases ("AASLD") and the Infectious Disease Society of America ("IDSA") set forth the medical standard of care for the treatment of

---

[2] For HCV, a "cure" is defined as a sustained virologic response—*i.e.*, no detectable HCV genetic material in the patient's blood—for three months following the end of treatment. ECF No. 35 at ¶ 66.

HCV. *Id*. at ¶¶ 67-68. The IDSA/AASLD guidelines recommend that all people with risk factors for HCV be tested, including both those born between 1945 and 1965 and those who were ever incarcerated. *Id*. at ¶ 75. The guidelines also recommend immediate treatment with DAA drugs for all people with chronic HCV. *Id*. at ¶ 69. The Centers for Disease Control and Prevention ("CDC") encourages healthcare professionals to follow this standard of care. *Id*. at ¶ 67. The Medicaid guidelines are consistent with this standard of care, as they eliminated any requirement that there be evidence of hepatic fibrosis before covering DAA treatments. *Id*. at ¶ 71.

The benefits of immediate treatment include immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, reduction in the likelihood of the manifestations of cirrhosis and associated complications, a 70 percent reduction in the risk of liver cancer, a 90 percent reduction in the risk of liver-related mortality, and a dramatic improvement in quality of life. *Id*. at ¶ 73. Delay in treatment increases the risk that treatment will be ineffective. *Id*. at ¶ 74.

## C. HCV Treatment at CT DOC

In 1997, CT DOC and the University of Connecticut Health Center ("UCHC") entered into a Memorandum of Agreement ("MOA") for the provision of health care to offenders through Correctional Managed Health Care ("CMHC"). *Id*. at ¶ 20. This MOA remained in place until July 1, 2018, when Semple terminated the relationship between DOC and UCHC and brought all health care functions "in house, to be controlled specifically by the DOC." *Id*. at ¶¶ 20-21. The MOA provided that CMHC would implement clinical practice guidelines and Medicaid guidelines. *Id*. at ¶ 70. CMHC's policy governing the treatment of prisoners with HCV ("Policy G 2.04") was promulgated on December 10, 2002, and revised on May 30, 2005, December 21, 2010, February 1, 2012, July 31, 2013, June 30, 2015, and June 30, 2016. *Id*. at ¶

91; ECF No. 35-1 (Policy G 2.04). The policy created a special board of infectious disease experts who evaluate all requests for treatment of the Hepatitis C infection in CT DOC facilities. ECF No. 35 at ¶ 93. It also created a Hepatitis C Utilization Review Board ("HepCURB") to review all requests for treatment. *Id*. at ¶ 95. The policy details the steps that physicians and the HepCURB should take when working with patients who have HCV. *Id*. at ¶¶ 97-99, 102, 106. Policy G 2.04 provides that, "in general," HepCURB will follow the specific recommendations of the AASLD and IDSA, which both recommend immediate treatment with DAAs for all people with chronic HCV; at the same time, the policy states that "they will not directly provide specific anti-viral drugs for Hepatitis C." *Id*. at ¶¶ 69, 95-96. CT DOC did not release any new guidelines for HCV treatment following the July 1, 2018 decision by Semple to change the management of health care services for DOC inmates. *Id*. at ¶ 104.

Plaintiffs allege that "prioritization for the DAA treatment as stated in Policy G 2.04, which places advanced HCV cases of hepatic fibrosis and liver transplant candidates at the top of the line is not in line with the standard of care" as "[d]elaying treatment until a patient is extremely sick has the perverse effect of withholding treatment from the patients who could benefit from it most, because the treatment is less effective for patients with the most advanced stages of the disease." *Id*. at ¶ 105. Plaintiffs allege that even if the policy was adequate, CT DOC does not follow the policy and, in practice, delays treatment for virtually all prisoners with HCV (regardless of disease progression) until the prisoner is released from prison or dies. *Id*. at ¶¶ 100, 105, 108-09, 113, 115. Plaintiffs further allege that the policy does not address liver transplantation, the only cure for people with decompensated cirrhosis, and does not address the need for liver cancer screening, "which is standard medical practice once individuals have progressed to advanced fibrosis or cirrhosis." *Id*. at ¶¶ 117-18.

### D.    Semple's Involvement

Semple was regularly made aware by CT DOC personnel that the MOA was unenforceable, poorly written, and a direct cause of prisoners receiving subpar medical treatment. *Id*. at ¶ 154. Dr. Kathleen Maurer, the CT DOC Medical Director, stated under oath that she repeatedly voiced concerns to Semple about prisoners not receiving care that satisfied the community standard of care. *Id*. at ¶¶ 122, 126. At some point, the problems with healthcare delivery led the Connecticut General Assembly to demand that the CT DOC issue a Request for Information ("RFI") to find new companies that might contract with DOC. *Id*. at ¶ 132. Dr. Maurer testified that she inquired about the RFI and Semple responded, on more than one occasion, that "[w]e cannot embarrass our state's flagship university," apparently referring to UCHC. *Id*. at ¶ 132. According to a story published in the *Manchester Journal-Inquirer*, Semple confirmed that he told Dr. Maurer not to embarrass UConn. *Id*. at ¶ 133. Semple never instructed anyone on his staff to monitor CMHC's performance or review compliance with the MOA. *Id*. at ¶¶ 136, 138, 140, 145, 147, 149, 152. Moreover, Semple did not regularly attend executive committee and management committee meetings, nor did he train anyone to attend those meetings. *Id*. at ¶¶ 141-42. Despite his awareness that the MOA was not enforceable, and despite his knowledge of CMHC's failures to provide adequate care, Semple instructed Deputy Commissioner Cheryl Cepelak to extend the MOA on June 26, 2015. *Id*. at ¶ 157.

### E.    Named Plaintiffs

#### i.    Plaintiff Barfield

Robert Barfield has been incarcerated since 1994 and was transferred to the custody of the CT DOC in August 2012. *Id.* at ¶¶ 174-75. He was diagnosed with Hepatitis C in 2006 while he was incarcerated in Nevada, *id*. at ¶ 177, and has chronic HCV, *id*. at ¶ 179. While in the

custody of the DOC, Barfield continually requested treatment for HCV, but was told that he did not meet the requirements for treatment and that he was not sick enough to be treated. *Id*. at ¶¶ 184-85. He filed numerous grievances complaining of his symptoms and requesting treatment, but all were denied. *Id*. at ¶ 186. CT DOC did not comply with Policy G 2.04 in Barfield's case, *id*. at ¶¶ 187, 191, 206, and he developed a number of medical issues that can be caused by HCV, *id*. at ¶¶ 199, 203, 208, 221. On April 13, 2017, Dr. Omprakash Pillai received a test showing that Barfield had a viral load of 4,567,000 in his blood plasma; a viral load of more than 800,000 is considered high, but Barfield was told that his viral load was normal. *Id*. at ¶ 223. His viral load continued to be very high in subsequent tests. *Id*. at ¶¶ 224, 226. Barfield specifically requested DAAs on more than one occasion, but was denied access to them. *Id*. at ¶¶ 218-19, 244. On June 1, 2017, Barfield's medical record indicates that a FibroScan –an ultrasound that determines the amount of fibrosis in a liver – would be requested for him. *Id*. at ¶¶ 81, 227. He had the liver scan approximately nine months later on March 12, 2018. *Id*. at ¶ 235. The liver scan showed that he had at least an 85 percent probability of significant fibrosis. *Id*. at ¶ 236. After filing several requests to obtain information about his condition, *id*. at ¶¶ 237-39, Barfield was informed on June 14, 2018, that he suffered from moderate fibrosis (F2 on the scale of F0 to F4), *id*. at ¶ 241. Barfield was informed that he would be considered for treatment, but that he would have to wait until the CT DOC fully transitioned medical care away from CMHC before the request for treatment could be considered. *Id*. at ¶ 242. Barfield was approved for DAAs after filing this suit. *Id*. at ¶ 247.

ii.       **Plaintiff Knapp**

John Knapp was a pretrial detainee in the custody of the CT DOC from March 9, 2018 through October 25, 2018.[3] *Id.* at ¶ 250. He pled guilty to two charges on October 25, 2018 and continued to be in the custody of the CT DOC. *Id.* at ¶ 249. Knapp already knew that he had HCV before entering into the custody of the CT DOC, but it was confirmed when he tested positive for HCV at the Hartford Country Correctional Center. *Id.* at ¶¶ 251-52. Knapp suffers from a variety of medical issues, including an echogenic (i.e., abnormally dense) liver and hepatic steatosis (inflammation and scarring caused by fat in the liver), which likely resulted from HCV. *Id.* at ¶¶ 254-59. He is also a recognized risk for cirrhosis of the liver. *Id.* at ¶ 261. When Knapp was transitioned from being a pretrial detainee to being fully committed to the custody of the CT DOC, he was not initiated through the HCV protocol as suggested by Policy G 2.04. *Id.* at ¶¶ 263-66. As of the filing of the operative complaint, Knapp was not receiving any treatment for his HCV. *Id.* at ¶ 264.

### iii.      Plaintiff Davis

Curtis Davis was diagnosed with HCV around 2011 and has been housed at Enfield Correctional Institution and Osborn Correctional Institution at times relevant to this case. *Id.* at ¶¶ 271-72. He suffers from gynecomastia, a disorder of the endocrine system, and fatigue, which are both symptoms of chronic HCV. *Id.* at ¶¶ 274-76. Davis repeatedly asked doctors and nurses for HCV treatment, but was denied. *Id.* at ¶ 277-79. When he asked for DAAs, the doctor told him that he was "not ever going to get that." *Id.* at ¶ 281. Davis had a FibroScan and doctors told him the DAAs may not work if the fatty tissue around his liver got any worse. *Id.* at ¶ 283. When Davis first reached out to Plaintiffs' counsel, he was not approved for DAAs; after speaking with

---

[3] Plaintiffs are not bringing a deliberate indifference claim under the Fourteenth Amendment on behalf of pretrial detainees. ECF No. 43 at 7 (Plaintiffs noting that "[t]his HCV class action is an Eighth Amendment case, not a Fourteenth Amendment case").

Plaintiffs' counsel, he was approved for treatment and began receiving DAAs before the operative complaint was filed. *Id*. at ¶ 284.

### iv.   Plaintiff Barberi

Jason Barberi was diagnosed with HCV on or about April 29, 2013, while he was being housed at Carl Robinson Correctional Institution. *Id*. at ¶ 288. At that meeting in 2013, the doctor told him that he would be a good candidate for treatment, but he was not consulted about treatment again until 2018. *Id*. at ¶ 289. He asked for treatment repeatedly from the time he was diagnosed until October 2018. *Id*. at ¶ 292. Barberi had a FibroScan in February 2018 and the results, which he received in June 2018, showed that he had stage 3 fibrosis. *Id*. at ¶¶ 298-99. After seeing these results, Barberi requested more information about his condition. *Id*. at ¶ 300. On August 1, 2018, he received a response explaining that treatment had been requested. *Id*. at ¶ 301. He then completed several request forms seeking information about the timeline for treatment. *Id*. at ¶¶ 302-04. On August 20 and 26, 2018, Barberi completed request forms seeking to speak with Plaintiffs' attorney Ken Krayeske. *Id*. at ¶¶ 305-06. On September 10, 2018, Barberi learned that his treatment had been approved. *Id*. at ¶ 307. As of September 30, 2018, he still did not know when his treatment would start. *Id*. at ¶ 308. On October 8, 2018, he requested a copy of his HCV treatment plan and learned that he still had no start date for his treatment. *Id*. at ¶ 309. He never received an HCV information packet, but he did begin treatment on or about October 22, 2018, i.e., before the operative complaint was filed. *Id*. at ¶¶ 309-10.

### v.   Plaintiff Tatem

Darnell Tatem has been HCV positive since at least 1999 and has been housed in Northern Correctional Institution, Cheshire Correctional Institution, or Osborn Correctional Institution at all times relevant to this action. *Id*. at ¶¶ 317, 319. When he came into the custody

of CT DOC in 2006, he had a brief conversation with a doctor about his HCV. *Id.* at ¶ 321. In addition to serious medical conditions unrelated to HCV, Tatem also has high blood pressure, which may be attributable to the virus. *Id.* at ¶¶ 322-29. He has requested DAAs, but was repeatedly told that his HCV needs to reach a certain level of dysfunction before he is eligible to receive treatment. *Id.* at ¶¶ 331-32, 336. He may have had an MRI and a FibroScan, but he is unsure. *Id.* at ¶¶ 337-38. He has not received any counseling about his HCV nor has he received an information packet about HCV. *Id.* at ¶ 330, 340. As of the filing of the operative complaint, the CT DOC had not completed its HCV protocol on Tatem. *Id.* at ¶ 342.

### F. Class Action and Relief Sought

Plaintiffs seek to certify a class of all current and future prisoners in CT DOC custody who have been diagnosed, or will be diagnosed, with chronic HCV. *Id.* at ¶ 346 & 69 ¶ A. They also seek the following injunctive relief:

> D. A preliminary and permanent injunction ordering Defendant to, among other things, 1) immediately identify all people in CT DOC's custody who have HCV; 2) immediately provide direct-acting antiviral medications to Plaintiff and Plaintiff Class, and 3) develop and adhere to a plan to provide direct-acting antiviral medications to all CT DOC prisoners with chronic HCV, consistent with the standard of care;

> E. A preliminary and permanent injunction requiring Defendant to, among other things, 1) properly screen, evaluate, monitor, and stage CT DOC prisoners with HCV (including screening for liver cancer where appropriate); 2) provide routine opt-out testing for HCV to all CT DOC prisoners; 3) develop and adhere to a policy allowing CT DOC prisoners with chronic HCV to obtain liver transplants if needed; and 4) modify the exclusions from HCV treatment based on life expectancy and time remaining on sentence to reflect an appropriate individual assessment;

ECF No. 35 at 69 ¶¶ D & E. Plaintiffs also seek a declaratory judgement "that the Defendant[s] ha[ve] exhibited deliberate indifference to the serious medical needs of Plaintiffs and the Plaintiff Class" in violation of the Eighth Amendment and "that Defendant[s] ha[ve] violated the rights of Plaintiffs and the Plaintiff Class under the Americans with Disabilities Act and the

Rehabilitation Act." *Id*. at 69 ¶¶ B & C. Finally, Plaintiffs seek compensatory damages, punitive damages, as well as attorneys' fees, costs, and litigation expenses. *Id*. at 70 ¶¶ H-J.

## II.     LEGAL STANDARDS

### A.     12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (internal quotation marks and citation omitted). The party "asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002). In resolving a motion to dismiss for lack of subject matter jurisdiction, a district court construes the complaint liberally and accepts all factual allegations as true. *Ford v. D.C. 37 Union Local 1549,* 579 F.3d 187, 188 (2d Cir. 2009). In addition, the court may refer to evidence outside the pleadings. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

### B.     12(b)(6)

Under Rule 12(b)(6), a court "must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008) (internal quotation marks omitted), and then determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. "After the court strips away

conclusory allegations, there must remain sufficient well-pleaded factual allegations to nudge plaintiff's claims across the line from conceivable to plausible." *In re Fosamax Products Liab. Litig.*, 2010 WL 1654156, at *1 (S.D.N.Y. Apr. 9, 2010) (internal quotation marks omitted). In deciding a Rule 12(b)(6) motion, the Court may consider documents attached to, integral to, or incorporated by reference in the complaint. Fed. R. Civ. P. 10(c); *Chambers v. Time Warner*, 282 F.3d 147, 152-53 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (internal quotations omitted).

## III.    DISCUSSION

### A.    Standing

The original complaint named only Barfield as a plaintiff and principally sought prospective relief, i.e., an injunction. ECF No. 1. In their initial motion to dismiss, Defendants argued that Barfield lacked standing because, by the time they filed their motion, he was approved for DAA treatment. ECF No. 14-1 at 10-13. Later, Plaintiffs filed an amended complaint in which they added four additional Plaintiffs and a claim for damages against Semple. ECF No. 35. Defendants then filed a supplemental motion to dismiss and "incorporate[d] [their] arguments" from the initial motion to dismiss. ECF No. 36 at 3. Although Defendants did not clarify whether they were incorporating their standing argument against the four new Plaintiffs, standing affects subject matter jurisdiction and the Court has its own obligation to determine that it has such jurisdiction. Because the operative complaint alleges that

some of the Plaintiffs have received DAAs, I now address the standing of each Plaintiff with respect to the claims for prospective relief.[4]

Under Article III of the United States Constitution, federal courts may hear only "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. One of the consequences of this restriction is that a federal court lacks jurisdiction over a case in which the plaintiff lacks standing. To show that he has standing to invoke the jurisdiction of an Article III court, the plaintiff must establish that (1) he suffered an "injury in fact," (2) there is "a causal connection between the injury and the conduct complained of," and (3) "it [is] likely . . . that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

"[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 185 (2000). In this case, Plaintiffs seek several different types of prospective relief:

> D. A preliminary and permanent injunction ordering Defendant to, among other things, 1) immediately identify all people in CT DOC's custody who have HCV; 2) immediately provide direct-acting antiviral medications to Plaintiff and Plaintiff Class, and 3) develop and adhere to a plan to provide direct-acting antiviral medications to all CT DOC prisoners with chronic HCV, consistent with the standard of care;

> E. A preliminary and permanent injunction requiring Defendant to, among other things, 1) properly screen, evaluate, monitor, and stage CT DOC prisoners with HCV (including screening for liver cancer where appropriate); 2) provide routine opt-out testing for HCV to all CT DOC prisoners; 3) develop and adhere to a policy allowing CT DOC prisoners with chronic HCV to obtain liver transplants if needed; and 4) modify the exclusions from HCV treatment based on life expectancy and time remaining on sentence to reflect an appropriate individual assessment;

---

[4] The furnishing of DAA treatment around the time of the filing of the operative complaint would not affect the standing of any Plaintiff to seek damages for past wrongs.

ECF No. 35 at 69.[5] Plaintiffs must show that they satisfy the three *Lujan* requirements of injury, causation, and redressability for each of these requested injunctions. *Pungitore v. Barbera*, 506 Fed. Appx. 40, 41 (2d Cir. 2012) (affirming lower court's conclusion that plaintiff lacked standing for injunctive relief and explaining that "[w]hile [plaintiff] has standing with respect to her damages claim, a plaintiff must demonstrate standing separately for each form of relief sought"); *Waskul v. Washtenaw County Community Mental Health*, 900 F.3d 250, 257 (6th Cir. 2018) ("That one of the Association's named members, and thus the Association, could establish standing to assert a due process *claim* and seek *other forms of relief* does not mean he, and thus the Association, had standing to pursue each form of injunctive relief sought here.") (emphasis in original; internal quotation marks, alterations, and citation omitted).

"[S]tanding is to be determined as of the commencement of suit." *Lujan*, 504 U.S. at 571 n.5; *see also Etuk v. Slattery*, 936 F.2d 1433, 1440-41 (2d Cir. 1991) (explaining that to determine whether a party has standing, a court "must look to the facts and circumstances as they existed at the time th[e] suit was initiated"). In this case, the original complaint, filed July 17, 2018, named only Barfield as a Plaintiff. *See* ECF No. 1. Later, on December 21, 2018, Plaintiffs' counsel filed a "corrected amended complaint," i.e., the operative complaint, adding Knapp, Davis, Barberi, and Tatem as Plaintiffs. Accordingly, I assess Barfield's standing in light

---

[5] The operative complaint also seeks a declaratory judgment that the Defendants "*ha[ve] exhibited* deliberate indifference to the serious medical needs of Plaintiffs and the Plaintiff Class and *have violated* Plaintiffs and the Plaintiff Class's right to be free from Cruel and Unusual Punishment . . ." ECF No. 35 at 69 ¶ B (emphasis added). It also seeks a declaratory judgment "that Defendant[s] *ha[ve] violated* the rights of Plaintiffs and the Plaintiff Class under the Americans with Disabilities Act and the Rehabilitation Act." *Id.* at 69 ¶ C (emphasis added). To the extent these requests seek declarations about past conduct, they are dismissed, as declaratory judgments are meant to be prospective, not retrospective. *Natl. Union Fire Ins. Co. of Pittsburgh, PA. v. Intl. Wire Group, Inc.*, 2003 WL 21277114, at *5 (S.D.N.Y. June 2, 2003) ("[D]eclaratory relief is intended to operate prospectively. There is no basis for declaratory relief where only past acts are involved.").

14

of the facts as they stood when the initial complaint was filed; *Bldg. and Const. Trades Council of Buffalo, New York and Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 151 (2d Cir. 2006) (explaining that, if an alleged violation ceased between the filing of the original complaint and the amended complaint, the plaintiff would still have standing because "[t]he critical time for determining whether there is an ongoing violation is when the complaint is filed") (internal quotation marks and citation omitted); *Edelhertz v. City of Middletown*, 2013 WL 4038605, at *3 (S.D.N.Y. May 6, 2013) ("Because plaintiff had standing to challenge the law at the time his original complaint was filed, plaintiff has standing to assert the claims set forth in the amended complaint."); and the standing of the remaining four Plaintiffs in light of the circumstances as they existed at the time the operative complaint was filed.

### i. Providing DAAs to Prisoners with Chronic HCV

Barfield, Knapp, and Tatem have adequately alleged standing to seek an injunction ordering Defendants to provide treatment with DAAs. *See* ECF No. 35 at 69 ¶¶ D(2)-(3). Davis and Barberi, however, have not established standing to seek such relief.

To obtain prospective relief, a plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998). In addition, "the plaintiff's injury must be actual or imminent to ensure that the court avoids deciding a purely hypothetical case in which the projected harm may ultimately fail to occur." *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003). Here, Barfield, Knapp, and Tatem have all alleged a likelihood of future injury sufficient to establish injury in fact. At the time the amended complaint was filed (in Barfield's case, at the time the suit was initiated), Knapp, Tatem, and Barfield were not receiving DAAs, and there was a likelihood that, as a result, their medical issues would continue to worsen. ECF

No. 35 at ¶ 247 (alleging that "Mr. Barfield was approved for DAAs *after* the filing of this suit" and that his "liver and his body have been damaged by the years of denial and delay of treatment") (emphasis added);[6] *id.* at ¶¶ 264, 256-57 (alleging that "Plaintiff Knapp . . . is not receiving any treatment for his HCV at this point" and that he suffers from "hepatic steatosis," which is a condition "induced directly by the HCV"); *id.* at ¶¶ 329, 336, 340, 342 (alleging that "[t]he CT DOC still has not completed its HCV protocol on Plaintiff Tatem," that "Plaintiff Tatem has filed at least one grievance seeking access to DAAs and was denied," that Tatem "has never received any counseling about his HCV," and that he "has high blood pressure, and is concerned the hypertension is related to his liver functioning").[7] Davis and Barberi, however, have not established a likelihood of future injury from the denial of DAA treatment as they began receiving DAAs before joining this litigation. *Id.* at ¶ 284 (alleging that Davis "has been approved for treatment and has begun treatment on DAAs"); ECF No. 43 at 5 (noting that Plaintiff Barberi began treatment before the operative complaint was filed).

Second, Barfield, Knapp, and Tatem have adequately alleged a causal connection. To satisfy this requirement, "the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). Plaintiffs allege that the Commissioner "has a non-delegable duty to provide constitutionally adequate medical care to all

---

[6] Because Barfield was treated with DAAs after filing the initial complaint, but before filing the amended complaint, ECF No. 35 at ¶¶ 245, 247, his Eighth Amendment claim for DAA treatment is now moot. The Court will address the impact of this mootness in its forthcoming ruling on class certification.

[7] These allegations of ongoing and future harm are likewise sufficient to overcome the Defendants' Eleventh Amendment objections. As the Defendants acknowledge, all that is necessary to invoke the *Ex parte Young* exception to Eleventh Amendment immunity is to allege an ongoing violation of federal law in support of a claim for injunctive relief against a state official in his official capacity. ECF No. 14-1 at 28. These allegations accomplish that task.

persons in his custody," *id.* at ¶ 14, and that "Conn. Gen. Stat. §§ 18-81 et seq. . . . designates the Commissioner of the DOC with responsibility to oversee all aspects of service to inmates in DOC custody, including healthcare," *id*. at ¶ 19. Barfield, Knapp, and Tatem allege that the Commissioner's failure to comply with these duties has caused them to suffer ongoing harm. *See, e.g.*, *id*. at ¶¶ 246, 266-67, 342-45. This is sufficient to establish a causal connection.

Finally, to establish redressability, "it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Here, Knapp, Tatem, and Barfield were not receiving DAAs at the time the operative complaint was filed (in Barfield's case, at the time the suit was initiated), and a favorable decision would require that they be adequately monitored, screened, evaluated, and treated with DAAs. ECF No. 35 at 69 ¶ D(2) (requesting an injunction ordering Defendants to "immediately provide direct-acting antiviral medications"). Accordingly, they have adequately alleged redressability.

As to Plaintiffs' request for an injunction ordering Defendants to "properly screen, evaluate, monitor, and stage CT DOC prisoners with HCV," *id*. at 69 ¶ E(1), the operative complaint alleges that these actions are part and parcel of treating individuals for chronic HCV, including with DAAs, *id*. at ¶¶ 75-88, and Knapp, Tatem, and Barfield have standing to seek this relief too. Similarly, they have standing to request an injunction requiring Defendants to "modify the exclusions from HCV treatment based on life expectancy," *id*. at 69 ¶ E(4), because any attempt to deny Barfield, Knapp, or Tatem DAA treatment, or restrict such treatment, based on their life expectancy would cause them harm and an injunction would prevent such harm.

### ii. Providing Liver Transplants When Needed

Barberi has adequately alleged standing to seek an order requiring Defendants to properly screen for liver cancer where appropriate and to allow liver transplants if needed. *See* ECF No.

35 at 69 ¶ E(1) & E(3). However, the remaining four Plaintiffs have not alleged facts to support standing to seek such relief.

First, Barberi satisfied the injury requirement by adequately alleging a likelihood of future injury. He began receiving DAAs only after meeting with Plaintiffs' counsel, *see* ECF No. 43 at 5, and this significant delay in treatment led to "*permanent* Stage 3 liver disease," ECF No. 35 at ¶ 314 (emphasis added). FibroScan results from June 2018 showed that he a measurement of 11.8 kilopascals (a measure of liver stiffness), *id*. at ¶¶ 83, 299, which corresponds to Stage 3 fibrosis, *id*. at ¶ 299. Because DAA treatment is "significantly less effective" for individuals with advanced fibrosis and those with decompensated cirrhosis "will likely die without liver transplants" even if given DAA treatment, *id*. at ¶¶ 114, 117, and because "Defendant's policy does not address liver transplantation," *id*. at ¶ 117, Barberi has shown a likelihood of future injury stemming from the CT DOC's failure to address the need for liver transplants for certain inmates infected with HCV. Similarly, because Barberi has stage 3 fibrosis, and "[f]ibrosis can also lead to hepatocellular carcinoma (liver cancer)," *id*. at ¶ 29, he has also shown a likelihood of future injury stemming from the CT DOC's failure to provide for liver cancer screening. Indeed, Plaintiffs allege that liver cancer screening "is standard medical practice once individuals have progressed to advanced fibrosis or cirrhosis." *Id*. at ¶ 118. None of the other named Plaintiffs have alleged imminent harm stemming from Defendants' failure to address liver transplantation and liver cancer screening. Although they allege that other named Plaintiffs suffer from medical issues related to chronic HCV, they do not allege that those conditions are so serious that there is an imminent need for a transplant or liver cancer screening. *See, e.g.*, *id*. at ¶ 241 (alleging that Barfield suffered from moderate fibrosis (F2 on the scale of F0 to F4), but

making no allegations that individuals with moderate fibrosis have an imminent need for a liver transplant or liver cancer screening).

Second, Barberi has adequately alleged a causal connection. As discussed in the preceding section, Plaintiffs allegations of the Commissioner's "non-delegable duty to provide constitutionally adequate medical care," *id.* at ¶ 14, and the Commissioner's statutorily-imposed responsibility to oversee all aspects of service to prisoners, *id.* at ¶ 19, together with the allegations concerning the Defendants' failure to address these features of HCV treatment, *id.* at ¶¶ 117-18, are sufficient to establish the requisite link between Defendants' actions and the alleged injury.

Finally, as to redressability, a favorable decision would make it more likely that Barberi would receive liver cancer screening and a liver transplant if needed. *Id.* at 69 ¶ E(1) (requesting an injunction requiring Defendants to properly "screen[] for liver cancer where appropriate"); *id.* at 69 ¶ E(3) (requesting an injunction requiring Defendants to "develop and adhere to a policy allowing CT DOC prisoners with chronic HCV to obtain liver transplants if needed"). In light of Plaintiffs allegations that those with decompensated cirrhosis "will likely die without liver transplants" even if given DAA treatment, *id.* at ¶¶ 114, 117, and that "[f]ibrosis can also lead to hepatocellular carcinoma (liver cancer)," *id.* at ¶ 29, an injunction requiring the development of a policy addressing liver transplants and liver cancer screening will likely redress Barberi's injury.

### iii. Identifying and Testing Prisoners

The named Plaintiffs have not adequately alleged standing to seek an injunction requiring Defendants to provide opt-out testing or to otherwise identify all prisoners with HCV. *See id.* at 69 ¶¶ D(1) & E(2). But, as explained below, if Plaintiffs prevail on the merits and on their pending class certification motion, it may be necessary to create a mechanism to identify all

prisoners with HCV so that they can be effectively treated with DAAs; if it becomes necessary, the Court will consider the need to identify prisoners with HCV more fully at a later stage.

None of the Plaintiffs have alleged a likelihood of future injury stemming from Defendants' failure to test them for HCV. In fact, it appears that all five named Plaintiffs were either tested before entering CT DOC's custody, or were tested at some point while in custody. *Id*. at ¶ 177 (alleging that Barfield was diagnosed with Hepatitis C in 2006 while he was incarcerated in Nevada); *id*. at ¶¶ 251-52 (alleging that Knapp already knew he had HCV before entering into the custody of the CT DOC, but that it was confirmed when he tested positive for HCV at the Hartford Country Correctional Center); *id*. at ¶¶ 271-72 (alleging that Davis was diagnosed with HCV around 2011 but not making clear whether or not this was in CT DOC custody); *id*. at ¶ 288 (alleging that Barberi was diagnosed with HCV on or about April 29, 2013, while he was being housed at Carl Robinson Correctional Institution); *id*. at ¶¶ 316, 319 (alleging that Tatem has been HCV positive since at least 1999 which appears to be before he entered CT DOC custody). As none of the named Plaintiffs has established injury in fact as to this form of relief, there is no need to address causation or redressability.

Nonetheless, the Court recognizes that if Plaintiffs prevail on the merits and on their pending class certification motion, it may be necessary to impose additional requirements to make the other relief to which they would be entitled effective. For example, it may be necessary to create a mechanism to identify all prisoners with HCV so that they can be effectively treated with DAAs. Therefore, although the named Plaintiffs lack standing to seek this relief on their own and thus the Court must dismiss the request for testing or otherwise identifying individuals with HCV at this time, it does so without prejudice, and should the Plaintiffs prevail on the merits, and on class certification, the Court will likely revisit this issue at a later stage. *C.f.* Fed.

R. Civ. P. 54(c) ("Every . . . final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.").[8]

* * *

In sum, Barfield, Knapp, and Tatem have adequately alleged standing to seek an injunction ordering Defendants to provide treatment with DAAs and related relief; and Barberi has adequately alleged standing to seek an injunction requiring Defendants to develop and adhere to a policy that screens individuals with advanced fibrosis or cirrhosis for liver cancer and that permits liver transplants when needed. In addition, if Plaintiffs prevail, the Court will consider the need to identify prisoners with HCV more fully at a later stage.

### B.    Eighth Amendment Claims: Counts I and IV

### i.    Deliberate Indifference to Medical Needs: Prospective Relief

Plaintiffs claim that Defendants exhibited deliberate indifference to their serious medical needs in violation of the Eighth Amendment. ECF No. 35 at ¶¶ 351-58 (Count One). Under the Eighth Amendment, a state has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). A plaintiff can "prevail on an Eighth Amendment claim arising out of medical care by showing that a prison official acted with 'deliberate indifference' to the inmate's serious medical needs." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). "The deliberate indifference standard embodies both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' Second, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (internal quotation marks and citations omitted).

---

[8] Moreover, the Court notes that opt-out testing or another method of identifying prisoners with HCV may be required to identify class members.

The seriousness of Plaintiffs' medical needs is not contested. ECF No. 14-1 at 14 (Defendants noting that "there is a line of Second Circuit cases, and district court cases within the Second Circuit which hold that HCV infection is a 'serious' medical condition"). "Hepatitis C qualifies as a serious condition for purposes of an Eighth Amendment analysis." *Johnson v. Wright*, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002); *see also Pabon v. Wright*, 2004 WL 628784, at *5 (S.D.N.Y. Mar. 29, 2004) ("It is well-established that Hepatitis C qualifies as a serious condition for purposes of an Eighth Amendment analysis."), *aff'd,* 459 F.3d 241 (2d Cir. 2006); *Parks v. Blanchette*, 144 F. Supp. 3d 282, 314 (D. Conn. 2015) ("It is well-established that Hepatitis C is sufficiently serious to satisfy the objective prong of the test for deliberate indifference.").

Plaintiffs' Eighth Amendment claim therefore turns on whether they have adequately alleged the subjective prong of the deliberate indifference standard. "Deliberate indifference is a mental state equivalent to subjective recklessness" and "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). That is, a "prison official does not act in a deliberately indifferent manner unless that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hathaway*, 37 F.3d at 66 (internal quotation marks omitted). "[M]ere malpractice of medicine in prison does not amount to an Eighth Amendment violation." *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000). But "refus[ing] treatment of a properly diagnosed condition that was progressively degenerative, potentially dangerous and painful, and that could be treated easily and without risk . . . is not mere medical malpractice." *Id.* (internal quotation marks omitted).

Deliberate indifference therefore "requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66.

Defendants argue that Plaintiffs' allegations do not establish deliberate indifference, but, at most, establish only negligence or disagreement over the proper course of treatment. ECF No. 14-1 at 16-21. I disagree. Plaintiffs plausibly allege that the DOC denied or delayed curative treatment despite knowing that the standard of care requires immediate treatment with DAAs for all individuals with chronic HCV, that the efficacy of DAAs decreases with delay, and that individuals with chronic HCV would likely suffer from serious medical issues if treatment was denied or delayed. These allegations are sufficient to establish a claim of deliberate indifference to medical needs.

The MOA between the CT DOC and the UCHC "indicated that CMHC would implement Medicaid guidelines and clinical practice guidelines." ECF No. 35 at ¶ 70. The AASLD/IDSA guidelines provide that the standard of care is "immediate treatment with DAA drugs for all persons with chronic HCV." *Id.* at ¶¶ 67-69. The Medicaid guidelines also support immediate treatment, as they "eliminated any requirement that there be any evidence of hepatic fibrosis before covering DAA treatments." *Id.* at ¶ 71. Despite these guidelines, the G 2.04 Policy states that CMHC physicians "will not directly provide specific anti-viral drugs for Hepatitis C," ECF No. 35-1 at 2, and "in practice almost no prisoners receive DAA medications," ECF No. 35 at ¶ 91. There are also significant delays in treatment, *id.* at ¶¶ 114, 128, despite the fact that delay "increases the risk that the treatment will be ineffective," *id.* at ¶ 74. Indeed, as to the five Plaintiffs, the allegations clearly establish that the CT DOC either denied or delayed access to DAAs despite knowing that all named Plaintiffs had HCV and were suffering from, or were at risk of suffering from, serious medical conditions as a result of their HCV infections. *See, e.g.,*

*id*. at ¶¶ 264, 256-57 (alleging that Plaintiff Knapp suffers from "hepatic steatosis," which is a condition "induced directly by the HCV"); *id.* at ¶¶ 312-13 (alleging that "Plaintiff Barberi's HCV was allowed to fester for five years, and HCV progressed to Stage 3 liver disease, before it was treated" and that "Plaintiff Barberi was damaged by CT DOC's delay and denial in treatment of his HCV").

Defendants argue that these allegations of delayed or denied DAA treatment do not establish deliberate indifference because "[w]hile it is natural for plaintiff[s] to have preferred speedier treatment with DAA's, the timing and course of treatment is a classic example of a[n] inmate patient disagreeing with the treatment provided by his physician," and therefore such allegations "fail[] to state a cognizable constitutional question." ECF No. 14-1 at 20-21. However, "deliberate indifference may be shown where prison officials erect arbitrary and burdensome procedures that 'result in interminable delays and outright denials of medical care to suffering inmates.'" *Ross v. Kelly*, 784 F. Supp. 35, 47 (W.D.N.Y. 1992) (quoting *Todaro v. Ward*, 565 F.2d 48, 53 (2d Cir. 1977)), *aff'd*, 970 F.2d 896 (2d Cir. 1992). Delayed treatment, even absent "arbitrary and burdensome procedures," may be sufficient to establish deliberate indifference. *Hathaway*, 37 F.3d at 67 (noting that a finding of deliberate indifference is possible where there is a "delay of over two years between the discovery of the [medical issue] and the time [the doctor] asked that [Plaintiff] be re-evaluated for surgery"); *Harrison*, 219 F.3d at 138 ("District courts in this Circuit have ruled that a one-year delay in treating a cavity can evidence deliberate indifference on the part of prison officials.").

Here, Plaintiffs allege that "Defendant's written policy (even if it was followed) of rationing treatment to patients who fit the elaborate criteria designed by CT DOC amounts to deliberate indifference to serious medical needs" because "[d]elaying or preventing treatment

until a patient manages the labyrinthine structure of approvals has the perverse effect of withholding treatment from the patients." ECF No. 35 at ¶ 107; *see also id.* at ¶ 108 ("Even if the policy were adequate, the CT DOC does not follow it because CT DOC provides treatment to almost none of the HCV-positive prisoners in its custody."); *id.* at ¶ 115 ("In practice, the CT DOC delays treatment for virtually all patients with HCV, regardless of their disease progression, until the patient is released from prison or dies.").

As Plaintiffs argue, and as other courts have held, "these facts plausibly allege a deliberate disregard for Plaintiffs' serious medical needs for DAA treatment in violation of the Eighth Amendment." *Postawko v. Missouri Dept. of Corrections*, 2017 WL 1968317, at *7 (W.D. Mo. May 11, 2017). In *Postawko*, the court explained that "[b]ecause chronic HCV is a progressive disease and delay in treatment with DAA drugs reduces the benefits associated with treatment, Defendant's policy [of delaying DAA treatment "until the disease has progressed to a far more serious level"] causes unnecessary and wanton infliction of pain and increases the risk of serious damage to the health of those inmates suffering from chronic HCV." *Id.*; *see also Smith v. Carpenter*, 316 F.3d 178, 186 n.10 (2d Cir. 2003) ("[W]hen medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment' but may properly be viewed as a 'refusal' to provide medical treatment"). Similarly, in *Chimenti*, the court found that Plaintiffs alleged facts sufficient to state a plausible Eighth Amendment claim where the HCV policy was to "ration[] treatment with DAADs[9] to prisoners with Chronic Hepatitis C based on the prisoner's fibrosis level," because that policy "denies or

---

[9] In *Chimenti*, the Court referred to direct-acting antiviral drugs as "DAADs." 2017 WL 3394605 at *2. I refer to these same drugs as "DAAs."

delays treatment with DAADs to the vast majority of prisoners with Chronic Hepatitis C infections, even though treatment with DAADs is the current standard of care for individuals with Chronic Hepatitis C infections." *Chimenti v. Pennsylvania Dept. of Corrections*, 2017 WL 3394605, at *9 (E.D. Pa. Aug. 8, 2017); *see also Harrison*, 219 F.3d at 139 ("[R]efus[ing] treatment of a properly diagnosed condition that was progressively degenerative, potentially dangerous and painful, and that could be treated easily and without risk . . . is not mere medical malpractice.").

Defendants also argue that Plaintiffs' Eighth Amendment claims must fail because Plaintiffs were "periodically tested, evaluated, and monitored by a specialist in infectious diseases." ECF No. 14-1 at 20; *see also id.* (noting that Defendants provided "appropriate supportive care . . . including management of their liver disease and its complications"). But where, as alleged here, the CT DOC knew that delay in treatment would cause harm yet still chose merely to monitor the condition or provide only supportive care, it has exhibited deliberate indifference. As the *Postawko* court explained, "Plaintiffs do not allege entitlement to some novel or cutting-edge course of treatment that constitutes something more than that required by the applicable standard of care," but instead, "allege[] that they are categorically denied access to the proper treatment for their HCV—DAA drug treatment—which is *the* medical standard of care as recommended by the CDC, IDSCA, and AASLD." *Postawko*, 2017 WL 1968317, at *7. In such circumstances, "opting for an easier and less efficacious treatment of the inmate's condition by adopting a monitoring policy instead of treatment and waiting to see just how much the inmate's health may deteriorate is not permissible." *Id.* Similarly, in *Abu-Jamal v. Wetzel*, the court explained that the Plaintiff "established a reasonable likelihood of success of showing that Defendants were deliberately indifferent to his serious medical need" because Defendants chose

a course of monitoring instead of treatment despite knowing "that (1) the standard of care is to administer DAA medications regardless of the disease's stage, (2) inmates would likely suffer from hepatitis C complications and disease progress without treatment, and (3) the delay in receiving DAA medications reduces their efficacy." 2017 WL 34700, at *18, *20 (M.D. Pa. Jan. 3, 2017). In *Chimenti* too, the court found that where the Defendants' policy "ration[ed] treatment with DAADs to prisoners with Chronic Hepatitis C based on the prisoner's fibrosis level," Plaintiffs' allegations were "more than a disagreement about Plaintiffs' medical treatment, or dissatisfaction with the DOC Defendants' denial of Plaintiffs' requests for treatment in favor of a different treatment with a possibility of success." *Chimenti*, 2017 WL 3394605, at *9.

Finally, in their supplemental Motion to Dismiss, Defendants argue that "judges in this district court have dismissed or granted summary judgment on claims challenging DOC's HCV treatment protocols on a number of grounds, including on the merits." ECF No. 36 at 9. They cite *Pelletier v. Armstrong*, 2007 WL 685181 (D. Conn. 2007); *Parks v. Blanchette*, 144 F. Supp. 3d 282 (D. Conn. 2015); and *Baxter v. Pesanti*, 2005 WL 1877200 (D. Conn. 2005). *Id.* As Plaintiffs note, however, all three of these cases concern access to Interferon in the years before DAAs became available. Such "cases are all read[ily] distinguishable" because "[t]he decision whether or not to use [prior] antiviral therap[ies] [was] a complex and controversial one," while modern DAAs have low-risk side effects, high success rates, and are recommended for nearly all individuals with HCV. *Wetzel*, 2017 WL 34700, at *17 n.12 (internal quotation marks and citation omitted). In addition, *Parks* is also factually distinct because it concerned delayed administration of the treatment due to the plaintiff's mental health condition. Finally, as both

Defendants and Plaintiffs note, all three of these decisions were rulings on summary judgment. Thus, these three cases are factually and procedurally inapposite.

In sum, Plaintiffs plausibly allege that Defendants delay treatment with DAAs until the HCV progresses to a late stage, or eschew treatment with DAAs altogether in favor of monitoring or late-stage supportive care, despite knowing that the standard of care requires immediate treatment with DAAs for all individuals with chronic HCV, that the efficacy of DAAs decreases with delay, and that individuals with chronic HCV will likely suffer from serious medical issues if treatment is denied or delayed. This is sufficient to establish deliberate indifference to serious medical needs.[10]

* * *

Accordingly, Defendants' motion to dismiss is DENIED as to the Eighth Amendment claim brought against Cook in his official capacity as Commissioner of CT DOC.

### ii. Deliberate Indifference to Medical Needs: Damages

Plaintiffs also bring a claim of deliberate indifference to medical needs against Semple, in his individual capacity, for money damages. ECF No. 35 at ¶¶ 379-83. While, as noted, Plaintiffs have sufficiently pled the elements of an Eighth Amendment claim for deliberate indifference to medical needs, to obtain damages, they must also allege Semple's personal involvement in the constitutional violation. Defendants argue that Plaintiffs' allegations are insufficient to establish

---

[10] Defendants do not argue in their motion to dismiss that Plaintiffs' allegations regarding liver cancer screening and liver transplantation fail to state a claim for deliberate indifference. The Court notes, briefly, that Plaintiffs allege (1) that Defendants' policy does not address liver cancer screening although it is "standard medical practice once individuals have progressed to advanced fibrosis or cirrhosis" and "liver cancer has a very dismal prognosis" "[u]nless there is regular surveillance to find cancers early and remove them surgically," *id*. at ¶ 118; and (2) that Defendants' policy does not address liver transplantation although it is "the only possible cure for people with decompensated cirrhosis," *id*. at ¶ 117.

Semple's personal involvement and, in any case, that he is protected by qualified immunity. I find that Plaintiffs have failed to allege Semple's personal involvement and therefore do not reach the issue of qualified immunity.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (internal quotation marks and citation omitted). Personal involvement may be shown in one of five ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). In addition, a plaintiff must demonstrate an affirmative causal link between the supervisory official's inaction and the plaintiff's injury. *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). Here, Plaintiffs seek to establish liability under the third *Colon* prong. ECF No. 43 at 11 ("The third prong of Colon presents Plaintiffs strongest argument: 'the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom.'") (quoting *Colon*, 58 F.3d at 873).[11] I find that Plaintiffs have not adequately alleged liability under this prong or any other.

---

[11] Defendants argue that the Supreme Court's decision in *Iqbal* may impact the continued validity of the *Colon* factors. ECF No. 14-1 at 22-23. However, they point to no circuit precedent on this question and district courts that have addressed the issue are split. Some district courts in this circuit have concluded that "only the first and third *Colon* factors have survived the Supreme Court's decision in *Iqbal*." *Spear v. Hugles*, 2009 WL 2176725, at *2 (S.D.N.Y. July 20, 2009). The majority view, however, is that "where, as here, the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth or Fourteenth Amendments, the personal

First, although Plaintiffs allege that Semple was aware that prisoners were receiving substandard care as a general matter, they make no factual allegations that he was aware of the treatment protocols or policies for chronic HCV. *See* ECF No. 35 at ¶¶ 70, 126 (alleging that "Dr. Maurer . . . repeatedly voiced her concern to Defendant Semple that the inmates were not receiving care that met the community standard of care" but not that she specifically voiced her concerns regarding HCV treatment); *id*. at ¶ 132 (alleging that problems with healthcare delivery became so apparent that the Connecticut General Assembly "demanded that the DOC issue [an RFI] to discover new companies that might contract with DOC," but not alleging that these concerns were related to HCV care); *id*. at ¶ 154 (alleging that "Defendant Semple was regularly made aware by CT DOC personnel, including Dr. Maurer, that the MOA was unenforceable, poorly written and was a direct cause of inmates in the care and custody of the DOC receiving subpar medical treatment that was known to endanger human life," but again making no allegations specific to HCV). Such general allegations could refer to "substandard care" in areas of medical practice having nothing to do with HCV, and are not enough to state a plausible claim that Semple was aware that the specific policy with regard to HCV treatment was substandard, or that the care being provided for HCV did not comply with that policy. Further, there is no non-conclusory allegation that Semple created, modified, administered, or even knew of Policy G 2.04 or any of its inadequacies detailed in the operative complaint.

Second, although Plaintiffs allege that Semple was aware of flaws in the MOA and instructed an employee to extend it, they do not make specific factual allegations suggesting a causal link between inadequacies in the MOA, on the one hand, and the G 2.04 Policy governing

involvement analysis set forth in *Colon v. Coughlin* may still apply." *Shepherd v. Powers*, 2012 WL 4477241, at *10 (S.D.N.Y. Sept. 27, 2012) (internal quotation marks omitted). I need not take sides in this debate because Plaintiffs primarily rely on the third *Colon* factor.

HCV treatment or the failure to follow that policy, on the other. Indeed, the allegations regarding Plaintiffs Knapp, Barberi, and Tatem suggest that delays and substandard treatment of HCV continued or even worsened after the MOA with UCHC was terminated on July 1, 2018. *See* ECF No. 35 at ¶¶ 249, 260-67 (although Knapp became a sentenced inmate of CT DOC in October 2018, and the doctor had recognized that he was a candidate for DAA treatment while he was a pre-trial detainee, he had still received no HCV treatment by the time the operative complaint was filed); *id*. at ¶¶ 300-10 (despite making inmate requests for treatment beginning July 30, 2018, Barberi received no DAA treatment until late October 2018); *id*. at ¶ 335 ("Since July 1, 2018, Plaintiff Tatem said that it is more difficult to access medical care in prison.").

In sum, Plaintiffs do not allege involvement by Semple in the creation or administration of the G 2.04 Policy or actual knowledge by him of inadequate treatment for HCV. Nor do their allegations establish a causal link between the inadequacies in the MOA of which Semple was allegedly aware and inadequate treatment for HCV. Their allegations establish only that Semple made high-level decisions about which provider group would provide healthcare to individuals in CT DOC custody, but this is insufficient to state a Section 1983 supervisory liability claim for damages. *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985) (requiring "a showing of more than the linkage in the prison chain of command" to hold a prison official liable under Section 1983); *Koehl v. Bernstein*, 2011 WL 2436817, at *19 (S.D.N.Y. June 17, 2011), *report and recommendation adopted,* 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011) (dismissing an Eighth Amendment claim where there were no facts in the complaint suggesting that the "defendants knew of, let alone approved, any alleged misconduct").

Plaintiffs' allegations are therefore insufficient to show Semple's personal involvement in the Eighth Amendment violation. Defendants' motion to dismiss is GRANTED as to the Eighth Amendment claim brought against Semple in his individual capacity.

### C. Americans with Disabilities Act and Rehabilitation Act Claims: Counts II and III

Title II of the ADA and § 504 of the Rehabilitation Act apply to inmates in state prisons. *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 213 (1998) (holding that "Title II of the ADA unambiguously extends to state prison inmates"); *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1036 (S.D.N.Y. 1995) ("The Rehabilitation Act has been held to apply to prisoner claims as a general matter . . . Further, the Act's references . . . are neither expressly nor implicitly limited in such a way as to exclude state prisoners."). Plaintiffs in this case rely on the following provision of the ADA:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Section 504 of the Rehabilitation Act similarly provides that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .

29 U.S.C. § 794(a). "[T]here are subtle differences between these disability acts, [but] the standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504 of federally assisted programs and activities." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (internal quotation marks and citation omitted). "Indeed, unless one of those subtle distinctions is pertinent to a particular case, we treat claims under the two statutes identically." *Id*. "In order to establish a violation under the

ADA, the plaintiffs must demonstrate that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities. Additionally, to establish a violation under the Rehabilitation Act, a plaintiff must show that the defendants receive federal funding." *Id.* (internal citation omitted).

Defendants do not appear to dispute that they are subject to these statutes or that they receive federal funding. Nor do they dispute that Plaintiffs are qualified individuals with a disability. Rather, Defendants argue that Plaintiffs fail to state a claim because they set forth no facts suggesting that they were denied the opportunity to participate in or benefit from Defendants' services, programs, or activities by reason of their disabilities. ECF No. 36 at 11 ("[T]here most certainly are no allegations to support the claim that they have been denied HCV treatment because of any real or perceived disability that served as the impetus for discrimination."). I agree.

"Neither the ADA nor the Rehabilitation Act applies to claims regarding the *quality* of medical services provided by correctional departments." *Montgomery v. Dept. of Correction*, 2017 WL 5473445, at *2 (D. Conn. Nov. 13, 2017) (emphasis added). "Moreover, the fact that a disabled prisoner is subject to adverse treatment does not constitute a violation of the ADA's [or Rehabilitation Act's] anti-discrimination provision[s] absent evidence that the adverse treatment was by reason of the prisoner's disability." *Currytto v. Furey*, 2019 WL 1921856, at *4 (D. Conn. Apr. 30, 2019). Thus, "[c]ourts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability." *Elbert v. New York State Dept. of Correctional Services*, 751 F.

Supp. 2d 590, 595 (S.D.N.Y. 2010). In *Elbert*, for instance, the court noted that although the plaintiff recited an element of his ADA claim in the complaint "almost verbatim," he did not allege any facts to support the legal conclusion, instead making only a "bare allegation of inadequate medical care." *Elbert*, 751 F. Supp. 2d at 596. The *Elbert* court explained that the plaintiff did not state a claim under the ADA because he was "claiming that [he] was not properly treated *for* his [disability], not that he was mistreated *because* of his [disability]." *Id.*

Similarly, Plaintiffs in this case allege that they did not receive proper HCV treatment and, apart from conclusory allegations reciting the elements of ADA and Rehabilitation Act claims, do not make any allegations to support an inference of discrimination or denial based on Plaintiffs' HCV. *See* ECF No. 35 at ¶ 365 ("By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant CT DOC excludes Plaintiff and the Plaintiff Class from participation in, and denies them the benefits of CT DOC services, programs, and activities (such as medical services), by reason of their disability."); *id.* at ¶ 366 ("By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant CT DOC subjects Plaintiff and the Plaintiff Class to discrimination."). Such conclusory allegations are insufficient. *Twombly*, 550 U.S. at 555 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (internal quotation marks and citations omitted); *see also Nails v. Laplante*, 596 F. Supp. 2d 475, 481–82 (D. Conn. 2009) (granting summary judgment to defendants on plaintiff's

ADA claim because the plaintiff "d[id] not include any non-conclusory allegations of discriminatory animus or ill will based on his disability").

Accordingly, Defendants' motion to dismiss is GRANTED as to the ADA and Rehabilitation Act claims.

## IV.     CONCLUSION

For the reasons discussed above, all claims brought by Plaintiff Davis and all claims concerning opt-out testing and identification of prisoners with HCV are DISMISSED for lack of standing; and the Defendants' motion to dismiss is GRANTED as to the Eighth Amendment claim against Semple in his individual capacity, GRANTED as to the Americans with Disabilities Act and Rehabilitation Act claims, and DENIED as to the Eighth Amendment claim against Cook in his official capacity.

IT IS SO ORDERED.

/s/ MICHAEL P. SHEA
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                August 6, 2019