| | |
|---|---|
| ROBERT BARFIELD, ET AL <br><br>       Plaintiffs, <br><br>       v. <br><br> ROLLIN COOK *in his official capacity as Commissioner of the Connecticut Department of Correction* <br><br>       Defendant. | No. 3:18-cv-1198 (MPS) |

**RULING ON CLASS CERTIFICATION**

Plaintiffs Robert Barfield, John Knapp, Jason Barberi, and Darnell Tatem (together, "named Plaintiffs" or "Plaintiffs") bring this putative class action lawsuit regarding medical care for incarcerated people infected with Hepatitis C against Rollin Cook in his official capacity ("Defendant") as Commissioner of the Connecticut Department of Correction ("CT DOC"). Following the Court's ruling on the Motion to Dismiss, the only claim remaining is Plaintiffs' claim for various forms of injunctive relief against Cook in his official capacity for deliberate indifference to medical needs in violation of the Eighth Amendment under 42 U.S.C. § 1983.[1]

---

[1] In the operative complaint, Plaintiffs brought suit against Commissioner Scott Semple in both his official and individual capacities. ECF No. 35 at ¶ 14. They alleged three claims against Semple in his official capacity as Commissioner of the CT DOC: (1) deliberate indifference to medical needs in violation of the Eighth Amendment under 42 U.S.C. § 1983 (Count One); (2) violation of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* (Count Two); and (3) violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* (Count Three). They also alleged deliberate indifference to medical needs in violation of the Eighth Amendment under 42 U.S.C. § 1983 against Semple in his individual capacity (Count Four). After Cook became the new Commissioner of the CT DOC, Plaintiffs moved to substitute Cook as the official capacity defendant under Federal Rule of Civil Procedure 25(d). ECF No. 44. Absent objection, the Court granted the motion to substitute. ECF No. 48. In its ruling on the Motion to Dismiss, the Court dismissed Counts Two, Three, and Four as well as all claims brought by Davis and certain claims

Plaintiffs move to certify a class consisting of "all people who are or will be prisoners in the custody of the [CT DOC], and who have or will have Hepatitis C while in custody and have not yet been cured." ECF No. 32 at 1. For the reasons discussed below, this motion is GRANTED to the extent set forth in this ruling.

## I. FACTS

These facts are drawn from the operative complaint, the parties' briefs on class certification, and the accompanying affidavits and exhibits.

### A. Hepatitis C

Hepatitis C is a blood-borne disease caused by the Hepatitis C Virus ("HCV"). ECF No. 35 at ¶ 25. HCV causes inflammation that damages liver cells, and is a leading cause of liver disease and liver transplants. *Id.* It is transmitted through contact with infected blood and can be transmitted through intravenous drug use, tattooing, blood transfusions, and sexual activity. *Id.* at ¶ 26. HCV can be either acute or chronic. *Id.* at ¶ 27. Acute HCV clears itself from the blood stream within six months of exposure. *Id.* Chronic HCV is a long-term illness that is defined as having a detectable HCV viral level in the blood six months after exposure. *Id.* People with chronic HCV develop fibrosis of the liver, which is a process that replaces healthy liver tissue with scarring, thereby reducing liver function. *Id.* at ¶ 29. When scar tissue takes over most of the liver, it is called cirrhosis. *Id.* at ¶ 30. Cirrhosis may not be reversible and can cause complications even after the HCV is treated. *Id.* at ¶ 33. Fibrosis can also lead to liver cancer. *Id.* at ¶ 29. In addition, chronic HCV can cause kidney disease, internal bleeding, and a host of other serious medical issues. *Id.* at ¶¶ 28-31, 35. It can also cause death. *Id.* at ¶ 31.

---

related to testing. ECF No. 60. Thus, only Count One remains, and only Barfield, Knapp, Barberi, and Tatem have standing to proceed.

Approximately 2.7 to 3.9 million Americans have chronic HCV and approximately 19,000 people die of HCV-caused liver disease each year in the United States. *Id*. at ¶¶ 39, 42. The prevalence of HCV in prison is much higher than in the general population. *Id*. at ¶ 44. It is not clear how many people in the CT DOC system have HCV, but a recent study shows that 10-12 percent of the population at the New Haven Correctional Center had HCV in 2015. *Id*. at ¶¶ 45, 55, 58.

## B. Standard of Care for HCV

In the past, the standard treatment for HCV, which included the use of interferon and ribavirin medications, had long treatment durations, failed to cure most patients, and was associated with many side effects. *Id*. at ¶ 62. In 2011, however, the Food and Drug Administration ("FDA") began approving new oral medications called direct-acting antiviral drugs ("DAAs"). *Id*. at ¶ 63.While the DAAs were initially designed to work with the old treatment regimen, in 2013 the FDA began to approve DAAs that can be taken alone. *Id*. DAAs work more quickly, cause fewer side effects, and treat chronic HCV more effectively than the old treatment; in fact, 90 to 95 percent of HCV patients treated with DAAs are cured, whereas the old treatment regime cured only roughly one-third of patients. *Id*. at ¶¶ 63-65.[2]

The American Association for the Study of Liver Diseases ("AASLD") and the Infectious Disease Society of America ("IDSA") set forth the medical standard of care for the treatment of HCV. *Id*. at ¶¶ 67-68. The IDSA/AASLD guidelines recommend that all people with risk factors for HCV be tested, including both those born between 1945 and 1965 and all those who were ever incarcerated. *Id*. at ¶ 75. The guidelines also recommend immediate treatment with DAA

---

[2] For HCV, a "cure" is defined as a sustained virologic response—*i.e.*, no detectable HCV genetic material in the patient's blood—for three months following the end of treatment. ECF No. 35 at ¶ 66.

drugs for all people with chronic HCV. *Id*. at ¶ 69. The Centers for Disease Control and

Prevention ("CDC") encourages healthcare professionals to follow this standard of care. *Id*. at ¶

67. The Medicaid guidelines are consistent with this standard of care, as they eliminated any

requirement that there be evidence of hepatic fibrosis before covering DAA treatments. *Id*. at ¶

71.

The benefits of immediate treatment include immediate decrease in liver inflammation,

reduction in the rate of progression of liver fibrosis, reduction in the likelihood of the

manifestations of cirrhosis and associated complications, a 70 percent reduction in the risk of

liver cancer, a 90 percent reduction in the risk of liver-related mortality, and a dramatic

improvement in quality of life. *Id*. at ¶ 73. Delay in treatment increases the risk that treatment

will be ineffective. *Id*. at ¶ 74.

### C.  HCV Treatment at CT DOC

In 1997, CT DOC and the University of Connecticut Health Center ("UCHC") entered

into a Memorandum of Agreement ("MOA") for the provision of health care to offenders

through Correctional Managed Health Care ("CMHC"). *Id*. at ¶ 20. This MOA remained in place

until July 1, 2018, when Semple terminated the relationship between DOC and UCHC and

brought all health care functions "in house, to be controlled specifically by the DOC." *Id*. at ¶¶

20-21. It provided that CMHC would implement clinical practice guidelines and Medicaid

guidelines. *Id*. at ¶ 70. CMHC's policy governing the treatment of prisoners with HCV ("Policy

G 2.04") was promulgated on December 10, 2002, and revised on May 30, 2005, December 21,

2010, February 1, 2012, July 31, 2013, June 30, 2015, and June 30, 2016. *Id*. at ¶ 91; ECF No.

35-1 (Policy G 2.04). The policy created a special board of infectious disease experts who

evaluate all requests for treatment of the Hepatitis C infection in CT DOC facilities. ECF No. 35

at ¶ 93. It also created a Hepatitis C Utilization Review Board ("HepCURB") to review all requests for treatment. *Id*. at ¶ 95. The policy details the steps that physicians and the HepCURB should take when working with patients who have HCV. *Id*. at ¶¶ 97-99, 102, 106. Policy G 2.04 provides that, "in general," HepCURB will follow the specific recommendations of the AASLD and IDSA, which both recommend immediate treatment with DAAs for all people with chronic HCV; at the same time, the policy states that "they will not directly provide specific anti-viral drugs for Hepatitis C." *Id*. at ¶¶ 69, 95-96. CT DOC did not release any new guidelines for HCV treatment following the July 1, 2018 decision by Semple to change the management of health care services for DOC inmates. *Id*. at ¶ 104.

Plaintiffs allege that "prioritization for the DAA treatment as stated in Policy G 2.04, which places advanced HCV cases of hepatic fibrosis and liver transplant candidates at the top of the line is not in line with the standard of care" as "[d]elaying treatment until a patient is extremely sick has the perverse effect of withholding treatment from the patients who could benefit from it most, because the treatment is less effective for patients with the most advanced stages of the disease." *Id*. at ¶ 105. Plaintiffs allege that even if the policy was adequate, CT DOC does not follow the policy and, in practice, delays treatment for virtually all prisoners with HCV (regardless of disease progression) until the prisoner is released from prison or dies. *Id*. at ¶¶ 100, 105, 108-09, 113, 115. Plaintiffs further allege that the policy does not address liver transplantation, the only cure for people with decompensated cirrhosis, and does not address the need for liver cancer screening, "which is standard medical practice once individuals have progressed to advanced fibrosis or cirrhosis." *Id*. at ¶¶ 117-18.

### D. Named Plaintiffs

#### 1. *Plaintiff Barfield*

Robert Barfield has been incarcerated since 1994 and was transferred to the custody of the CT DOC in August 2012. *Id.* at ¶¶ 174-75. He was diagnosed with Hepatitis C in 2006 while he was incarcerated in Nevada, *id.* at ¶ 177, and has chronic HCV, *id.* at ¶ 179. While in the custody of the DOC, Barfield continually requested treatment for HCV, but was told that he did not meet the requirements for treatment and that he was not sick enough to be treated. *Id.* at ¶¶ 184-85. He filed numerous grievances complaining of his symptoms and requesting treatment, but all were denied. *Id.* at ¶ 186. CT DOC did not comply with Policy G 2.04 in Barfield's case, *id.* at ¶¶ 187, 191, 206, and he developed a number of medical issues that can be caused by HCV, *id.* at ¶¶ 199, 203, 208, 221. On April 13, 2017, Dr. Omprakash Pillai received a test showing that Barfield had a viral load of 4,567,000 in his blood plasma; a viral load of more than 800,000 is considered high, but Barfield was told that his viral load was normal. *Id.* at ¶ 223. His viral load continued to be very high in subsequent tests. *Id.* at ¶¶ 224, 226. Barfield specifically requested DAAs on more than one occasion, but was denied access to them. *Id.* at ¶¶ 218-19, 244. On June 1, 2017, Barfield's medical record indicates that a FibroScan – an ultrasound that determines the amount of fibrosis in a liver – would be requested for him. *Id.* at ¶¶ 81, 227. He had the liver scan approximately nine months later on March 12, 2018. *Id.* at ¶ 235. The liver scan showed that he had at least an 85 percent probability of significant fibrosis. *Id.* at ¶ 236. After filing several requests to obtain information about his condition, *id.* at ¶¶ 237-39, Barfield was informed on June 14, 2018, that he suffered from moderate fibrosis (F2 on the scale of F0 to F4), *id.* at ¶ 241. Barfield was informed that he would be considered for treatment, but that he would have to wait until the CT DOC fully transitioned medical care away from CMHC before

the request for treatment could be considered. *Id*. at ¶ 242. Barfield was approved for DAAs only after filing this suit. *Id*. at ¶ 247. By the time Defendant filed his opposition to class certification, Barfield had completed treatment for HCV and had completely cleared the Hepatitis C virus. ECF No. 52-1 at ¶ 18.

### 2. *Plaintiff Knapp*

John Knapp was a pretrial detainee in the custody of the CT DOC from March 9, 2018 through October 25, 2018.[3] ECF No. 35 at ¶ 250. He pled guilty to two charges on October 25, 2018 and continued to be in the custody of the CT DOC. *Id*. at ¶ 249. Knapp already knew that he had HCV before entering into the custody of the CT DOC, but it was confirmed when he tested positive for HCV at the Hartford Country Correctional Center. *Id*. at ¶¶ 251-52. Knapp suffers from a variety of medical issues, including an echogenic (i.e., abnormally dense) liver and hepatic steatosis (inflammation and scarring caused by fat in the liver), which likely resulted from HCV. *Id*. at ¶¶ 254-59. He is also a recognized risk for cirrhosis of the liver. *Id*. at ¶ 261. When Knapp was transitioned from being a pretrial detainee to being fully committed to the custody of the CT DOC, he was not initiated through the HCV protocol as set forth in Policy G 2.04. *Id*. at ¶¶ 263-66. As of the filing of the operative complaint, Knapp was not receiving any treatment for his HCV. *Id*. at ¶ 264. However, he was started on a course of DAA treatment with Mavyret on May 24, 2019, and is scheduled to complete treatment on August 16, 2019. ECF No. 52-1 at ¶ 29.

---

[3] Plaintiffs are not bringing a deliberate indifference claim under the Fourteenth Amendment on behalf of pretrial detainees. ECF No. 43 at 7 (Plaintiffs noting that "[t]his HCV class action is an Eighth Amendment case, not a Fourteenth Amendment case").

### 3. *Plaintiff Barberi*

Jason Barberi was diagnosed with HCV on or about April 29, 2013, while he was being housed at Carl Robinson Correctional Institution. ECF No. 35 at ¶ 288. At that meeting in 2013, the doctor told him that he would be a good candidate for treatment, but he was not consulted about treatment again until 2018. *Id*. at ¶ 289. He asked for treatment repeatedly from the time he was diagnosed in 2013 until October 2018. *Id*. at ¶ 292. Barberi had a FibroScan in February 2018 and the results, which he received in June 2018, showed that he had stage 3 fibrosis. *Id*. at ¶¶ 298-99. After seeing these results, Barberi requested more information about his condition. *Id*. at ¶ 300. On August 1, 2018, he received a response explaining that treatment had been requested. *Id*. at ¶ 301. He then completed several request forms seeking information about the timeline for treatment. *Id*. at ¶¶ 302-04. On August 20 and 26, 2018, Barberi completed request forms seeking to speak with Plaintiffs' attorney Ken Krayeske. *Id*. at ¶¶ 305-06. On September 10, 2018, Barberi learned that his treatment had been approved. *Id*. at ¶ 307. As of September 30, 2018, he still did not know when his treatment would start. *Id*. at ¶ 308. On October 8, 2018, he requested a copy of his HCV treatment plan and learned that he still had no start date for his treatment. *Id*. at ¶ 309. He never received an HCV information packet, but he did begin treatment on or about October 22, 2018, i.e., before the operative complaint was filed. *Id*. at ¶¶ 309-10. By the time Defendant filed his opposition to class certification, Barberi had completed treatment for HCV and had completely cleared the Hepatitis C virus. ECF No. 52-1 at ¶ 18.

### 4. *Plaintiff Tatem*

Darnell Tatem has been HCV positive since at least 1999 and has been housed in Northern Correctional Institution, Cheshire Correctional Institution, or Osborn Correctional Institution at all times relevant to this action. ECF No. 35 at ¶¶ 317, 319. When he came into the

custody of CT DOC in 2006, he had a brief conversation with a doctor about his HCV. *Id*. at ¶ 321. In addition to serious medical conditions unrelated to HCV, Tatem also has high blood pressure, which may be attributable to the virus. *Id.* at ¶¶ 322-29. He has requested DAAs, but was repeatedly told that his HCV had to reach a certain level of dysfunction before he would be eligible to receive treatment. *Id*. at ¶¶ 331-32, 336. He may have had an MRI and a FibroScan, but he is unsure. *Id*. at ¶¶ 337-38. He has not received any counseling about his HCV nor has he received an information packet about HCV. *Id*. at ¶¶ 330, 340. As of the filing of the operative complaint, the CT DOC had not completed its HCV protocol on Tatem. *Id*. at ¶ 342. However, since then, Dr. Pillai recommended treatment with DAAs and Tatem was scheduled to start a course of DAAs on June 7, 2019. ECF No. 52-1 at ¶¶ 24-25.

### E. Class Action and Relief Sought

Plaintiffs seek to certify "a class of all current and future prisoners in CT DOC custody who have been diagnosed, or will be diagnosed, with chronic HCV." ECF No. 35 at ¶ 346; *see also id*. at 69 ¶ A. They also seek an injunction ordering Defendant to provide routine opt-out testing for all CT DOC prisoners or otherwise identify all prisoners who are infected with chronic HCV; to properly screen, evaluate, monitor, and stage CT DOC prisoners with HCV; to modify the exclusions from HCV treatment; to immediately provide direct-acting antiviral medications to those with chronic HCV; and to provide liver transplants where appropriate. *Id*. at 69 ¶¶ D-E.[4]

---

[4] Plaintiffs' claims for declaratory judgment and damages were dismissed in the Court's ruling on the Motion to Dismiss. *See* ECF No. 60.

## II.     LEGAL STANDARDS

A party seeking class certification must satisfy each of the requirements set forth in

Federal Rule of Civil Procedure 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "Courts commonly use a shorthand summary to describe these

requirements, referring to the four prongs simply as 'numerosity,' 'commonality,' 'typicality,'

and 'adequacy.'" *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 98 (E.D.N.Y. 2012). In addition

to satisfying the prerequisites listed in Rule 23(a), a party seeking class certification must also

satisfy one of the subsections of Rule 23(b). Plaintiffs seek to certify a class under subsection

23(b)(2), which requires them to show that "the party opposing the class has acted or refused to

act on grounds that apply generally to the class, so that final injunctive relief or corresponding

declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The

Rule 23 requirements must be established by at least a preponderance of the evidence." *Brown v.

Kelly*, 609 F.3d 467, 476 (2d Cir. 2010). "In evaluating a motion for class certification, the

district court is required to make a definitive assessment of Rule 23 requirements,

notwithstanding their overlap with merits issues, and must resolve material factual disputes

relevant to each Rule 23 requirement." *Id.* (internal quotation marks and citations omitted).

## III. DISCUSSION

### A. Threshold Issues

Before turning to the Rule 23 requirements, I address three threshold arguments raised by Defendant: (1) that Barfield and Barberi have completed, and Barfield has been cured by, DAA treatment, and their claims are therefore moot; (2) that Plaintiffs Knapp and Tatem have failed to exhaust their administrative remedies before bringing suit, as required by the PLRA; and (3) that Plaintiffs' proposed class definition is overbroad and unworkable.

#### 1. Mootness

Defendant argues that Barfield's claims for injunctive relief are moot because he began receiving DAA treatment shortly after this lawsuit was filed.[5] ECF No. 35 at ¶ 247; ECF No. 52 at 7-9. In fact, Dr. Pillai explains that Barfield has now completed treatment for HCV and has "completely cleared the Hep C virus." ECF No. 52-1 at ¶¶ 4, 18. I begin by noting that even if Barfield's claims for injunctive relief are moot, class certification would still be proper as long as one named Plaintiff has a live claim, and Defendant does not argue that the claims of Knapp or Tatem – one of whom had only begun and the other of whom had not yet begun DAA treatment when Defendant filed his brief – are moot. *See Butler v. Suffolk County*, 289 F.R.D. 80, 91 n.4 (E.D.N.Y. 2013) (explaining that the "entire discussion [as to whether the claims of two Named Plaintiffs were moot] is academic" because two of the other "Named Plaintiffs are still incarcerated in the [facility] and, thus, unquestionably have standing to seek the declaratory and

---

[5] Defendant argues that the "mootness problem also applies with equal force to two other proposed plaintiff representatives, Mr. Davis and Mr. Barberi, who have both also been treated with direct acting-antivirals (DAA's) and have been cured." ECF No. 52 at 9; *see also* ECF No. 52-1 at ¶ 18 (stating that Davis and Barberi "have completed treatment for HCV" and that Davis is "cured"). I do not address Defendant's mootness argument as to Davis because he lacks standing to seek injunctive relief and his claims have been dismissed. *See* ECF No. 60. As to Barberi, I address mootness and his status as a class representative below.

injunctive relief requested"); *see also Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (holding that

standing of single plaintiff was sufficient for Article III purposes); *Comer v. Cisneros*, 37 F.3d

775, 788 (2d Cir. 1994) ("[O]nly one named plaintiff need have standing with respect to

each claim."). But in any event, I disagree with Defendant's mootness argument as to Barfield. I

conclude that while the Court may no longer be able to afford Barfield relief on his individual

claims for injunctive relief, application of the relation back exception to mootness is warranted,

and he may continue to proceed as a named Plaintiff in this action to represent the class.

"A case is moot, and accordingly the federal courts have no jurisdiction over the

litigation, when the parties lack a legally cognizable interest in the outcome." *Fox v. Bd. of

Trustees of State U. of New York*, 42 F.3d 135, 140 (2d Cir. 1994) (internal quotation marks and

citation omitted). That is, "under the general rule of mootness, courts' subject matter jurisdiction

ceases when an event occurs during the course of the proceedings or on appeal that makes it

impossible for the court to grant any effectual relief whatever to a prevailing party." *County of

Suffolk, N.Y. v. Sebelius*, 605 F.3d 135, 140 (2d Cir. 2010) (internal quotation marks and citation

omitted).

In class actions, however, "an individual plaintiff may continue to represent the interests

of others even after any prospect of individual recovery has vanished." *Comer v. Cisneros*, 37

F.3d 775, 798 (2d Cir. 1994) (quoting 13A Charles A. Wright, *et al., Federal Practice and

Procedure* § 3533.9, at 391 (1984 & Supp.1994)). The Supreme Court explained the rationale for

this exception to the mootness doctrine as follows:

> There may be cases in which the controversy involving the named plaintiffs is such that it
> becomes moot as to them before the district court can reasonably be expected to rule on a
> certification motion. In such instances, whether the certification can be said to 'relate
> back' to the filing of the complaint may depend upon the circumstances of the particular
> case and especially the reality of the claim that otherwise the issue would evade review.

*Sosna v. Iowa*, 419 U.S. 393, 402 n.11 (1975). Applying this exception is appropriate when the defendant seeks to moot a claim prior to certification to avoid judicial scrutiny of the merits of the claim. In *White v. Mathews*, for instance, the plaintiffs challenged delays in administrative hearings and the Second Circuit explained that "[r]efusing to [apply the relation back doctrine] would mean that the [defendant] could avoid judicial scrutiny of its procedures by the simple expedient of granting hearings to plaintiffs who seek, but have not yet obtained, class certification." 559 F.2d 852, 857 (2d Cir. 1977); *see also Goetz v. Crosson*, 728 F. Supp. 995, 1000 (S.D.N.Y. 1990) ("Of particular concern is the potential ability of the defendant to purposefully moot the named plaintiffs' claims after the class action complaint had been filed but before the class had been properly certified.").

Although "[c]ourts generally apply the relation back doctrine to permit class representation by individuals whose claims have become moot *after* the filing of a motion for class certification but before resolution of that motion," "[it] is also appropriate where . . . the claims of the named plaintiff have become moot *before* a motion for class certification is filed so long as a justiciable controversy existed some time prior to class certification." *Crisci v. Shalala*, 169 F.R.D. 563, 567 (S.D.N.Y. 1996) (emphasis added). Indeed, the rationale underpinning the relation back doctrine is equally applicable where the defendant intends to moot the named plaintiffs' claims after the filing of a class action complaint but before the filing of a class certification motion. Application of the doctrine may be necessary in such circumstances "to prevent the race to the courthouse from entirely circumventing and stymieing the class action mechanism." *White v. OSI Collection Services, Inc.*, 2001 WL 1590518, at *6 (E.D.N.Y. Nov. 5, 2001). In *Crisci*, for instance, after the named plaintiffs sued alleging biased conduct by a particular ALJ, defendants transferred all the named plaintiffs' cases to a different ALJ before

the plaintiffs filed a motion for class certification; the court determined that the "issue of [the ALJ's] allegedly biased conduct thus would evade review if class certification were not deemed to relate back to the filing of the complaint." *Crisci*, 169 F.R.D. at 568. In *White*, too, the court applied the relation back exception where the defendant made an offer of judgment to the named plaintiff after she filed a complaint with class allegations, but before she filed a motion to certify the class. *White*, 2001 WL 1590518. The *White* court explained that declining to apply an exception to the mootness doctrine in such a situation "would ignore defendant's strategic tender of an offer of judgment very early in the litigation" and "would clearly hamper the sound administration of justice[] by forcing a plaintiff to make a class certification motion before the record for such motion is complete." *Id*. at *4-5 (internal quotation marks omitted).

Similarly, in this case, the allegations in the operative complaint and the information set forth in Defendant's class certification briefing suggest that Defendant has sought to "pick off" and strategically moot the named Plaintiffs' claims regarding treatment with DAAs by providing them with DAA treatment as soon as Defendant learned of their claims. Although Barfield continually requested treatment for HCV and filed numerous grievances complaining of his symptoms, he was approved for treatment with DAAs only after filing this suit. ECF No. 35 at ¶¶ 184-86, 247. Likewise, "[w]hen Plaintiff Davis first reached out to counsel in this case months ago to join, he was not approved for DAAs," but "[s]ince speaking with counsel, he has been approved for treatment and has begun treatment on DAAs." *Id.* at ¶ 284.[6] Similarly, Barberi's treatment was approved only *after* he wrote an inmate request form "seeking to reach out to" Plaintiffs' counsel, despite his repeated requests for treatment over the preceding years. *Id*. at ¶¶

---

[6] Although the Court dismissed Davis's claims for lack of standing, ECF No. 60, Defendant's conduct towards Davis is still illustrative of its overall intent in responding to claims concerning treatment for HCV.

292, 304-07. As for Tatem, Defendant began treating him with DAAs after he joined this suit while simultaneously disavowing his need for treatment. ECF No. 52-1 at ¶¶ 23-24 (explaining that there is "no medical necessity for immediate treatment," but "based on the patient's motivation and interest in treatment, [the doctor] recommended treatment with Mavyret x 8 weeks" and is "looking into see [*sic*] whether he can start treatment as soon as possible though there is no risk of any harm to the patient"). So even though Defendant does not believe Tatem requires DAAs, he now states that Tatem "will be starting treatment, possibly starting on Friday 06-07-19." ECF No. 52-1 at ¶ 25. Application of the relation-back doctrine is warranted because of Defendant's apparent attempt to moot the claims of the named Plaintiffs and the ease with which he can accomplish this with respect to any future plaintiffs who might be named. Thus, Barfield may continue to serve as a class representative despite the fact that he has already completed treatment with DAAs.

\* \* \*

In sum, I apply the relation back doctrine and reject the argument that Barfield's claims are moot. Thus, the three named Plaintiffs who have standing to seek DAAs—Barfield, Knapp, and Tatem—may serve as class representatives seeking such relief on behalf of the class. Moreover, because Barberi has standing to seek a liver transplant, *see* ECF No. 60, and there are no allegations or argument suggesting that this claim is moot, he is eligible to serve as a class representative seeking such relief on behalf of the class.[7]

---

[7] In their motion for class certification, Plaintiffs sought "the approval of Robert Barfield, John Knapp and Darnell Tatem as class representatives." ECF No. 32 at 1-2. They did not mention Jason Barberi or Curtis Davis. However, in Plaintiffs' supplemental brief in support of their motion for class certification, they appeared to seek approval of all five individuals as named Plaintiffs. ECF No. 51. Defendant's opposition to class certification addressed all five individuals, ECF No. 52, as did Plaintiffs' reply, ECF No. 53. Because Defendant had an opportunity to brief this motion as to all five putative class representatives, I treat Plaintiffs'

## 2. *Exhaustion of Administrative Remedies*

Defendant makes two related arguments about exhaustion: first, he argues that Knapp and Tatem are not adequate class representatives because they failed to exhaust administrative remedies; and second, he argues that "every potential putative class member, in order to have a cause of action, needs to exhaust administrative remedies." ECF No. 52 at 15-19. The Prison Litigation Reform Act ("PLRA") states that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In the class action context, however, a number of courts have invoked a doctrine known as "vicarious exhaustion," holding that the PLRA's exhaustion requirement is satisfied as long as at least one member of the proposed prisoner class has exhausted applicable remedies. I agree with these courts and conclude that, because Defendant does not contest that Barfield and Barberi have satisfied the PLRA's exhaustion requirement, the requirement is satisfied as to all class members.

"Congress enacted [the exhaustion provision of the PLRA] to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter*, 534 U.S. at 524–25. This purpose is satisfied "when one plaintiff in a class action has exhausted his administrative remedies." *Lewis v. Washington*, 265 F. Supp. 2d 939, 942

---

motion as having sought the approval of all five individuals as class representatives. Of course, Davis may not serve as a class representative as his claims were dismissed in the Court's ruling on the Motion to Dismiss. *See* ECF No. 60.

(N.D. Ill. 2003). "To require each inmate with the same grievance to exhaust their administrative remedies would be wasteful, and as long as prison officials have received a single complaint addressing each claim in a class action, they have the opportunity to resolve disputes internally and to limit judicial intervention in the management of prisons." *Id.* (internal quotation marks and citation omitted); *see also In re Nassau County Strip Search Cases*, 2010 WL 3781563 at *8 (E.D.N.Y. Sept. 22, 2010*)* ("[G]iven that exhaustion allows prison officials an opportunity to address the merits of a claim and that requiring all class members to exhaust could unduly burden a complaint system, tethering exhaustion to named plaintiffs makes sense."). Vicarious exhaustion therefore serves two important purposes. First, as long as prison officials have received a complaint addressing each claim in a class action, it puts them on notice and permits them to address the issue: "Once the prison officials have received a single complaint addressing each claim in a class action, they have the opportunity to resolve disputes internally and to limit judicial intervention in the management of prisons." *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004) (internal quotation marks and citation omitted). Second, it avoids an "intolerable burden upon the inmate complaint review system." *Id.* (citation omitted).

Accordingly, "a class of prisoner-plaintiffs certified under Rule 23(b)(2) satisfies the PLRA's administrative exhaustion requirement through 'vicarious exhaustion,' i.e., when one or more class members has exhausted his administrative remedies with respect to each claim raised by the class." *Id.* (internal quotation marks, alterations, and citation omitted); *see also Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004) (finding that one class member's exhaustion of administrative remedies was sufficient to satisfy the PLRA's exhaustion requirement for the class of prisoners challenging conditions of confinement on death row) (citing Wright & Miller § 1776 (2d ed. 1986)); *Chimenti v. Wetzel*, 2018 WL 2388665, at *5 (E.D. Pa. May 24, 2018)

(finding, in a case concerning access to DAAs for prisoners with HCV, that "if any of the named Plaintiffs . . . have satisfied the PLRA's administrative exhaustion requirement, the exhaustion requirement is satisfied for all of the absent class members through vicarious exhaustion"); *Butler v. Suffolk County*, 289 F.R.D. 80, 97 (E.D.N.Y. 2013) (finding the PLRA's exhaustion requirement satisfied as to the entire class where the class representatives exhausted their administrative remedies as to allegedly unconstitutional conditions); *Scott v. Clarke*, 64 F. Supp. 3d 813, 832 n.10 (W.D. Va. 2014) (concluding that the efforts of the named plaintiffs and several other class members, who fully exhausted their prison medical grievances, "easily support[ed] a finding of PLRA exhaustion on behalf of the entire class" under the principle of vicarious exhaustion); *c.f. United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1130 (2d Cir. 1974) (finding that, because two named plaintiffs as well as another member of the class presented identical challenges to the constitutionality of their sentences in state court, they fulfilled the habeas exhaustion requirement on behalf of the class and there was no need to "inundate[] the state courts with applications which would be as time-consuming as they would be useless").

Thus, to defeat Plaintiffs' claims for DAAs on exhaustion grounds, Defendant must establish that no Plaintiff exhausted his administrative remedies as to that claim. "[F]ailure to exhaust is an affirmative defense under the PLRA" and "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007). Here, Plaintiffs allege that Barfield "submitted an inmate administrative remedy form and demanded DAAs," ECF No. 35 at ¶ 234, and that he "has filed numerous grievances, complaining of his symptoms and requesting treatment, and appealed them, yet they have all been denied," *id*. at ¶ 186; *see also id*. at ¶¶ 194, 203, 237-40 (alleging that Barfield filed several grievances and inmate request forms related to his HCV). They also allege that Barberi "asked

repeatedly for treatment for HCV from the time he was diagnosed until October 2018," *id.* at ¶ 292, that he "wrote an inmate request for to [*sic*] Deputy Warden," *id.* at ¶ 302, and that he "kept having to write to medical to get the results because they never got back to [him]," *id.* Although these allegations do not expressly state whether or not Barfield and Barberi followed the administrative exhaustion procedures set forth in DOC Administrative Directive 8.9, ECF No. 52-4, and described in Defendant's brief, ECF No. 52 at 16-17, Defendant does not contest Plaintiffs' allegations of exhaustion. Defendant states that "Mr. Barfield . . . arguably did exhaust" and that they "do not address the exhaustion claims of plaintiffs Barfield, Barberi and Davis . . . ." ECF No. 52 at 17-18 & 18 n.5.

* * *

Failure to exhaust does not defeat claims by the putative class members at this stage of litigation. Because Defendant does not contest that Barfield and Barberi have satisfied the PLRA's exhaustion requirement, the requirement is satisfied as to all class members.

### 3. *Class Definition*

Plaintiffs' proposed class definition is "[a]ll people who are or will be prisoners in the custody of the Connecticut Department of Correction, who have or will have Hepatitis C and have not yet been cured." ECF No. 32-1 at 5. Defendant argues that this definition is unworkable because CT DOC "runs a unified state correctional system [in] which all prisoners, both unsentenced pre-trial detainees and convicted sentenced offenders, are all commingled into one unified system." ECF No. 52 at 13. Plaintiffs' proposed class definition would therefore include pre-trial detainees with HCV who are detained for less than the eight to twelve weeks required to complete a course of DAA treatment. *Id.* at 14. In their reply, Plaintiffs explain that they "grasp the concerns presented about constructing a class definition that does not account for the short stays in a unified system" and go on to propose a series of alternative class definitions based on

classes certified in different jurisdictions. ECF No. 53 at 19-21. I agree with Defendant's objection, and so I modify the class definition. *See Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001) (noting that district courts have "the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted"); *see also* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). The revised definition of the class I certify in this ruling is as follows:

> All sentenced persons (1) who have been or will be diagnosed with chronic Hepatitis C; (2) who are or will be in the custody of the Connecticut Department of Corrections; and (3) who have at least sixteen weeks remaining to serve on their sentences.

This revised class definition limits class membership to sentenced prisoners as Plaintiffs expressly disclaim any intent to bring a deliberate indifference claim under the Fourteenth Amendment on behalf of pretrial detainees. ECF No. 43 at 7 (Plaintiffs noting that "[t]his HCV class action is an Eighth Amendment case, not a Fourteenth Amendment case"). The revised definition also limits membership to those with at least sixteen weeks remaining to serve on their sentences. Because DAA drugs are typically administered over eight weeks, ECF No. 52 at 14, or twelve weeks, ECF No. 35 at ¶ 64, limiting membership to those with at least sixteen weeks remaining to serve on their sentences provides Defendant with at least four weeks to screen and evaluate individuals before starting them on treatment. Because the parties have not yet had an opportunity to comment on this class definition, I will consider any proposed amendments to this definition if and when Plaintiffs prevail on the merits.

### B. Rule 23(a)

#### 1.    *Numerosity*

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." In the Second Circuit, "[n]umerosity is presumed for classes larger than forty members." *Pennsylvania Pub. Sch. Employees' Ret. System v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014), *as amended* (Nov. 12, 2014); *see also Hill v. City of New York*, 136 F. Supp. 3d 304, 353 (E.D.N.Y. 2015), *order amended and supplemented*, 2019 WL 1900503 (E.D.N.Y. Apr. 29, 2019) ("While there is no magic minimum number to establish numerosity, courts in the Second Circuit generally presume that a class consisting of 40 or more members is sufficiently numerous.") (internal quotation marks omitted). The Defendant in this case does not contest numerosity. ECF No. 52 at 4-5. ("[T]he defendant[] do[es] not contest numerosity. Obviously, with an inmate population of nearly 13,000 inmates, there are more than 40 inmates who have chronic HCV infection.").

Accordingly, Plaintiffs have sufficiently alleged numerosity.

#### 2.    *Commonality*

The commonality requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The class claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "In other words, the relevant inquiry is whether a classwide proceeding is capable of generating common *answers* apt to drive the resolution of the litigation." *Jacob v. Duane Reade, Inc.*, 602 Fed. Appx. 3, 6 (2d Cir. 2015) (internal quotation marks, alteration, and citation omitted). Defendant argues that the

commonality requirement is not satisfied because "each individual prisoner-patient is completely different." ECF No. 52 at 7. However, Plaintiffs have sufficiently alleged several common questions that go to the core of this class action.

The following common questions are central to the validity of the class claims: (1) whether the standard of care requires immediate treatment with DAAs for all individuals with chronic HCV; (2) whether individuals with chronic HCV will suffer from serious medical issues if treatment is delayed or denied; (3) whether the G 2.04 Policy was consistent with the standard of care; (4) whether the Defendant's practices were consistent with the standard of care; (5) whether Defendant, in practice, delayed treatment for virtually all patients with chronic HCV; (6) whether Defendant erected burdensome procedures to access treatment for chronic HCV; and (7) whether the Defendant's actions constitute deliberate indifference to a serious medical need. These common questions easily meet the commonality requirement. *Butler v. Suffolk County*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013) ("Whether the County was aware of and deliberately indifferent to the conditions at the [correctional facility] is a common question subject to class-wide resolution."); *McGee v. Pallito*, 2015 WL 5177770, at *4 (D. Vt. Sept. 4, 2015) (finding that the determination of whether a prison policy amounted to deliberate indifference presented a "common issue" and explaining that "common questions . . . frame the ultimate question of whether the Defendant's policy violates the Constitution, such that they should be enjoined from implementing it").

Indeed, in upholding the certification of a class of prisoners seeking nearly identical injunctive relief – treatment with DAAs for chronic HCV – the Eighth Circuit explained that Defendants' argument that "that the unique medical condition of each member of the class means that resolving their claims will require a 'highly individualized' inquiry" "misunderstands the

nature of the class's claims." *Postawko v. Missouri Dept. of Corrections*, 910 F.3d 1030, 1038 (8th Cir. 2018). As in *Postawko*, Plaintiffs in this case "assert that the failure of the Defendant[] to screen properly for a life-threatening disease and provide appropriate treatment exposes all inmates suffering from chronic HCV to the *same* unconstitutional injury." *Id*. So although "the physical symptoms eventually suffered by each class member may vary, . . . the question asked by each class member is susceptible to common resolution." *Id*. at 1038-39.

Accordingly, Plaintiffs have sufficiently alleged commonality.

### 3. *Typicality*

"Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001) (internal quotation marks and citation omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993).

Here, Plaintiffs allege that the same unlawful conduct—namely, a policy or custom of delaying or denying treatment with DAAs for individuals with chronic HCV and the failure to address liver transplants for individuals with decompensated cirrhosis—was directed at the named Plaintiffs and the class sought to be represented. So minor variations in the individual claims, like Tatem's "unique form of HCV," ECF No. 52 at 12, do not undermine typicality. And although "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation," *Baffa v. Donaldson,*

*Lufkin & Jenrette Securities Corp.*, 222 F.3d 52, 59 (2d Cir. 2000), no such defenses have been identified here. The Court has already rejected Defendant's mootness argument, *see* Section III.A.1, exhaustion argument, *see* Section III.A.2, and most of its standing argument, *see* ECF No. 60.

Accordingly, Plaintiffs have sufficiently alleged typicality.

### 4. *Adequacy*

Adequacy requires "inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa*, 222 F.3d at 60. "The focus is on uncovering conflicts of interest between named parties and the class they seek to represent. In order to defeat a motion for certification, however, the conflict must be fundamental." *In re Flag Telecom Holdings, Ltd. Securities Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks and citations omitted).

As to the first adequacy inquiry, Defendant argues that the named Plaintiffs have a conflict with the class because they are seeking money damages while absent class members are seeking treatment. ECF No. 52 at 20-21. However, the Court granted Defendant's motion to dismiss the money damages claim. *See* ECF No. 60. Defendant's standing, mootness, and exhaustion arguments have also been addressed by the Court, *see* Section III.A.1; Section III.A.2; ECF No. 60, and similarly fail to pose an impediment to the adequacy requirement. Finally, as Plaintiffs note, the named Plaintiffs and absent class members "share a common goal" of securing appropriate treatment for chronic HCV. ECF No. 51 at 22-23.

As to the adequacy and experience of class counsel, Defendant takes no position. ECF No. 52 at 21. Although Plaintiffs' counsel do not have extensive experience litigating class actions, Attorney Krayeske has experience litigating collective actions under the Fair Labor

Standards Act (which present some similar issues), and both Attorney Krayeske and Attorney Ward have experience litigating civil rights cases related to medical care in prison. ECF No. 32-1 at 13. Attorney Ward also has professional experience that may be valuable in the case of any attempts at pre-trial resolution. *Id*. It is also clear that class counsel has spent significant time, effort, and resources in communicating with named Plaintiffs, investigating Defendant's policies and practices, and researching class claims.

In sum, Plaintiffs have satisfied both prongs of the adequacy requirement.

### C. Rule 23(b)

"Rule 23(b)(2) provides that an action may be maintained as a class action if, in addition to the threshold requirements of numerosity, commonality, typicality, and adequacy of representation, 'the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.'" *Parker v. Time Warner Ent. Co., L.P.*, 331 F.3d 13, 18 (2d Cir. 2003) (quoting Fed. R. Civ. P. 23(b)(2)). Defendant does not contest that certification under Rule 23(b)(2) is proper; indeed, he notes that "the plaintiffs challenge the existing, uniform policy of the defendant Commissioner governing HCV care for incarcerated persons, and the defendant Commissioner intends to continue to have one uniform policy that applies to all inmates." ECF No. 52 at 3-4. Rather, Defendant argues that class certification is unnecessary under the Second Circuit's decision in *Galvan v. Levine*, 490 F.2d 1255 (2nd Cir. 1973). I disagree.

### *The __Galvan__ Rule*

"Under the doctrine established by the Second Circuit's decision in *Galvan v. Levine*, [490 F.2d 1255 (2nd Cir. 1973)] certification of a Rule 23(b)(2) class is unnecessary

when prospective relief will benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment." *Casale v. Kelly*, 257 F.R.D. 396, 406 (S.D.N.Y. 2009) (internal quotation marks and citations omitted). The *Galvan* rule does not require a plaintiff to prove that class certification is necessary; it merely makes it "'permissible' for a court to deny certification if the 'class action designation is largely a formality.'" *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 541 (E.D.N.Y. 2017) (quoting *Galvan v. Levine*, 490 F.2d 1255, 1261-62 (2nd Cir. 1973)). "The court has wide discretion" in making this decision. *Id*. Courts have focused on the following four factors in determining whether class certification is appropriate under *Galvan*:

> *First*, notwithstanding the presumption that government officials will abide by a court's decision as to similarly situated individuals, an affirmative statement from the government defendant that it will apply any relief across the board militates against the need for class certification. *Second*, withdrawal of the challenged action or non-enforcement of the challenged statute militates against the need for class certification. *Third*, the type of relief sought can affect whether class certification is necessary. Courts have found that where the relief sought is merely a declaration that a statute or policy is unconstitutional, denial of class certification is more appropriate than where plaintiffs seek complex, affirmative relief. *Fourth*, courts also consider whether the claims raised by plaintiffs are likely to become moot, making class certification necessary to prevent the action from becoming moot.

*Casale*, 257 F.R.D. at 406–07.

Turning to the first factor, Defendant asserts that "the Commissioner of Correction agrees to be bound by a ruling as to one or more of the plaintiffs and apply that ruling to the entire inmate population." ECF No. 52 at 4. Despite this statement, Defendant strenuously contests the existence of commonality and typicality, arguing that "each individual prisoner-patient is completely different." *Id*. at 7; *see also id*. at 5 (discussing the "unique and individual treatment needs of each individual patient" and "the individual professional medical judgment of the patient's primary care provider"). These contradictory assertions suggest that Defendant may not

apply a ruling that requires treatment with DAAs for one plaintiff to other plaintiffs who are (in Defendant's view) "completely different" or have "unique and individual treatment needs." The assurance that the Defendant would apply any ruling to the entire inmate population therefore does not weigh heavily against class certification. *Hurley v. Ward*, 584 F.2d 609, 611–12 (2d Cir. 1978) (explaining that *Galvan* is inapposite where the "State . . . has made no concession that the issues presented by [application of the practice to] all prisoners . . . are identical to those raised by [application of the practice to named Plaintiff]"); *Bishop v. New York City Dept. of Hous. Preservation and Dev.*, 141 F.R.D. 229, 241 (S.D.N.Y. 1992) ("It is plainly inconsistent for Defendants to argue that any relief granted in connection with this action will be applied to benefit every member of the class, while at the same time they contest the existence of commonality and typicality.").

As to the second factor, Defendant has not withdrawn or replaced Policy G 2.04. He notes that "the plaintiffs challenge the existing, uniform policy of the defendant Commissioner governing HCV care for incarcerated persons, and the defendant Commissioner intends to continue to have one uniform policy that applies to all inmates," but he does not make any claims of withdrawing or replacing the policy or changing any of the alleged practices. ECF No. 52 at 3-4. This factor therefore counsels in favor of class certification. *Bishop v. New York City Dept. of Hous. Preservation and Dev.*, 141 F.R.D. 229, 241 (S.D.N.Y. 1992) (explaining that in *Galvan*, "the State had voluntarily taken concrete steps toward redressing the complained of harms"); *Finch v. New York State Off. of Children and Fam. Services*, 252 F.R.D. 192, 203 (S.D.N.Y. 2008) (explaining that the second *Galvan* factor weighed in favor of class certification because "the State has not withdrawn the challenged policy or made any indication that it plans to alter it").

The third *Galvan* factor also counsels in favor of class certification as Plaintiffs do not merely seek a finding that Defendant's policy is unconstitutional; rather, Plaintiffs seek injunctive relief that would require Defendant to take affirmative steps to implement and execute a wide-ranging plan for screening, treating, and monitoring prisoners with chronic HCV. Where the remedy sought "require[s] affirmative action on the part of the state to upgrade a constitutionally insufficient practice, the Court does not have the same confidence that class certification is an unnecessary 'formality.' Were *Galvan* taken to this extreme, certification pursuant to Rule 23(b)(2) would never be appropriate, because the very facts which would make certification possible would render it unnecessary." *Jane B. by Martin v. New York City Dept. of Soc. Services*, 117 F.R.D. 64, 72 (S.D.N.Y. 1987) (quoting *Milburn v. Coughlin,* No. 79 Civ. 5077, slip op. at 3 (S.D.N.Y. Nov. 26, 1980)). "Certification of the class is necessary to guarantee that mandatory relief runs to the benefit of all members of the class." *Id.*

Finally, as discussed in detail in Section III.A, the claims raised by Plaintiffs are likely to become moot and class certification is necessary to prevent the entire action from becoming moot. The fourth *Galvan* factor therefore also weighs in favor of class certification.

\* \* \*

In sum, final injunctive relief respecting the class as a whole is appropriate and *Galvan* does not compel denial of class certification. Accordingly, I find that that Plaintiffs have satisfied the requirements to certify a class under Rule 23(b)(2).

IV.    **CONCLUSION**

For the reasons discussed above, the motion for class certification is GRANTED to the extent set forth in this ruling. Accordingly, the Court orders as follows:

First, the following class is certified: All sentenced persons (1) who have been or will be diagnosed with chronic Hepatitis C; (2) who are or will be in the custody of the Connecticut Department of Corrections; and (3) who have at least sixteen weeks remaining to serve on their sentences.

Second, Robert Barfield, John Knapp, Darnell Tatem, and Jason Barberi are appointed as class representatives.

Third, Attorneys Kenneth J Krayeske and DeVaughn L. Ward are appointed as class counsel.

/s/ MICHAEL P. SHEA

Michael P. Shea, U.S.D.J.

Dated:       Hartford, Connecticut
             August 6, 2019